**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 19-cr-315 (ESH)** |
| | : | |
| **DESHAWN HOOD,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motion to suppress evidence. In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

**FACTUAL BACKGROUND**

On September 16, 2019 at approximately 11:30 p.m., members of the Metropolitan Police Department's (MPD) Narcotics and Special Investigations Division (NSID) Gun Recovery Unit (GRU) were driving in a high-crime area in the 600 block of 42nd Street, Northeast, in Washington, D.C. when they observed an individual, later identified as Deshawn Hood (defendant), walking in front of their vehicle. Defendant observed the officers and voluntarily greeted them.

Officers James Jacobs and Nelson Torres made contact with defendant, who was now walking in the 4200 block of Foote Street, Northeast with his arms in the air and his shirt up providing clear view of his sweatpants. He did so of his own volition and unsolicited by any conversation or commands by the officers. The incident is captured on police body-worn camera

1

(BWC) footage (attached as Exhibits A and B).[1] *See* Exhibit A at 02:01. The officers exited their vehicle, and Officer Jacobs observed a large bulge in the front of defendant's sweatpants, inconsistent with human anatomy. *Id.* at 02:07. Around the same time, Officer Jacobs said, "Hold on a sec" as defendant stated, "You do not have consent to search me," as he walked away from the officers. *Id.* at 02:04. Defendant continued to walk away from the officers. *Id.* at 02:06. Officer Jacobs asked defendant to stop and about the large bulge in the front of his sweatpants. *Id.* at 02:13. Defendant responded by saying, "That's my dick," and began to lower his hands towards his waistband. *Id.* at 02:16 and 02:27. Officer Jacobs instructed defendant to stop reaching for his pants. *Id.* Officers asked defendant again about the obvious bulge in his sweatpants. *See* Exhibit B at 02:25. Officer Steven Murrell patted the area where the bulge was observed and immediately recognized it as a firearm. *Id.* at 02:30. Defendant was then arrested. *Id.* at 2:37.

Less than a minute after defendant is arrested, another officer can be observed on BWC video tapping the firearm still in defendant's pants. *Id.* at 3:11. There is a distinctive tapping sound of metal hitting metal. *Id.* Another officer also searches defendant's waistband area, noting that the firearm was loaded and had an extended magazine. *Id.* at 3:20.

The firearm was determined to be a Glock model 27, .40 caliber handgun with a serial number of KWH774. When it was recovered, it was loaded with one (1) round in the chamber and twenty-one (21) rounds of ammunition in the unknown capacity magazine.

On September 18, 2019, a grand jury returned an indictment that charged defendant with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

---

[1] A copy of this pleading with a disk containing the aforementioned BWC footage of Officer Jacobs (Exhibit A) and Officer Joseph (Exhibit B) will be delivered to chambers.

Defendant now moves to suppress all evidence seized from the September 16, 2019 incident and all fruits resulting from the seizure, asserting in conclusory fashion that officers lacked any particularized suspicion that defendant was involved in any illegal activity.  Def.'s Mot. ECF. #19 at 4.  Defendant further argues that the officers' initial interaction with defendant was "so overpowering that it constituted an arrest . . . "  *Id.*  Again, defendant cites to no facts or law in support of his bald assertion that the initial interaction was an arrest.  Accordingly, the government submits that in light of the BWC footage submitted as Exhibits A and B to this opposition; the fact that the officers had reasonable suspicion that defendant was armed and dangerous prior to any seizure; and there was probable cause to arrest defendant once the firearm was discovered, this Court should deny defendant's motion to suppress.

## ARGUMENT

i.      *The Initial Stop and Frisk of Defendant Was Based Upon Reasonable Articulable Suspicion that Defendant was Armed and Dangerous*

Officers lawfully conducted a protective pat down because there was reasonable suspicion that defendant was armed with a firearm based on a visibly apparent bulge in his waistband prior to any seizure. A seizure occurs only when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). A citizen's liberty is only restrained if "a reasonable person would have believed that he was not free to leave[.]" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). The question is not what the subjective belief of the defendant was at the time but whether "a reasonable man, innocent of any crime" would have believed himself free to leave. *United States v. Goddard*, 491 F. 3d 457, 460 (D.C. Cir. 2007) (per curiam).

The Supreme Court of the United States has made clear that officers are allowed to take steps to assure themselves that the person with whom they are dealing is not armed with a firearm.

*Terry*, 392 U.S. 1, 19, 23 (1968) ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at a close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threats of physical harm."). *Terry* makes clear that a protective search for weapons is justified where a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

The Supreme Court case of *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) is directly on point. In *Mimms*, the Court held that there is "little question" that the officer's pat down of Mimms was justified where a bulge in Mimms's jacket was observed. *Id.* at 111-12. In *Mimms*, officers observed Mimms driving with an expired license plate. *Id.* at 107. One of the officers approached and asked Mimms to step out of the car and produce his driver's license and registration. *Id.* It was at this time that the officer observed a large bulge under Mimms's sports jacket. *Id.* Fearing that the bulge was a weapon, the officer proceeded to frisk Mimms and discovered a firearm in his waistband. *Id.* The Court held that the limited search for weapons was proper once the officer observed the bulge under Mimms's coat. *Id.* at 111-12.

Here, the facts are similar to *Mimms*. The BWC footage from Officer Jacobs (Exhibit A) makes clear that upon seeing the officers exit their vehicle, defendant had placed his shirt up and his arms in the air, showing to the officers in plain sight, the obvious large bulge consistent with a firearm in his waistband. Contrary to defendant's assertion that the officers' "initial interaction was so overpowering that it constituted an arrest," it was only after seeing the bulge that the officers approached defendant. The BWC footage makes clear that there were no accusations levelled prior to the officers seeing the bulge in defendant's waistband. It was around the same time that Officer

Jacobs saw the bulge that he said, "Hold on a sec," as defendant kept moving away with the bulge plainly visible. It is clear that by the point Officer Jacobs stated, "Stop walking away, and let me ask you about that bulge in the front of your pockets," he had already seen the bulge, and had sufficient cause to stop and frisk defendant.  Accordingly, the moment the officers saw the bulge in defendant's waistband—*i.e.* before they even approached defendant—they had reasonable articulable suspicion to stop defendant and conduct a protective pat down of his person. There was no seizure of defendant prior to that moment as the officers had not approached defendant until after viewing the bulge.

### ii. There Was Reasonable Articulable Suspicion because of the High Crime Area, Late Hour, and Defendant's Atypical Behavior

Further, there was reasonable suspicion to stop and frisk defendant because of the totality of the circumstances surrounding his encounter with law enforcement warranted a *Terry* stop. In determining whether reasonable suspicion exists, officers are to consider whether all the facts "taken together [warrant] further investigation" and may consider behavior that would normally be innocent conduct, such as pacing. *Terry*, 392 U.S. at 22. Officers are permitted to take into account a wide range of factors in making the reasonable suspicion determination. *Id.* (Officers can take account of strange or atypical behavior).[2]  Indeed, the Supreme Court has held that an "act of evasion," "certainly suggestive" of criminal activity, satisfies the reasonable suspicion requirement for police to stop and frisk an individual. *Wardlow*, 528 U.S. at 125 (holding that defendant's flight in a high crime neighborhood provided sufficient reasonable suspicion to stop

---

[2]     *See also Wardlow v. Illinois*, 528 U.S. 119, 125 (2000) (officers may take account of the fact that an individual is in a high crime area because they need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry).

him and frisk for a weapon); *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (obvious attempts to evade the police support the reasonable suspicion requirement); *see also Terry*, 392 U.S. at 27. Furthermore, the subjective motivations of the police in making a stop or a frisk are irrelevant; the test is whether the facts known to the police established a reasonable articulable suspicion in an objective matter.

Here, the combination of the following factors: high crime area; the late time of night; and defendant's strange and atypical behavior of lifting his arms and shirt in the air unsolicited, is sufficient to establish reasonable suspicion. *See Wardlow* 528 U.S. at 125; *see also Laing*, 889 F.2d at 286. While mere presence in a high-crime area alone would be insufficient to establish reasonable suspicion, the probative value of this factor is well-established. *See Wardlow* at 124; *see also United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003).  The importance of this factor is further compounded by the lateness of the hour. *Brown* at 1165. Finally, when one adds defendant's unusual behavior of immediately lifting his arms and shirt while walking away from the police, the totality of the circumstances in the encounter with defendant sufficiently established reasonable suspicion for a *Terry* stop.

### *iii. The Words, "Hold On a Sec," Did Not Amount to Seizure*

Even presuming that there was no reasonable suspicion prior to Officer Jacobs's first words to defendant, the phrase, "hold on a second," did not result in a seizure. First, it was not a seizure because those words are insufficient to rise to the level of show of authority that would trigger a seizure. Secondly, it was not a seizure because the defendant did not submit to those words.

Recent D.C. Circuit court cases find that a seizure occurs "only if: (1) a reasonable person would feel, under all the circumstances, he could not disregard the police inquiries and go about his business; (2) the restraints imposed upon him result from the police conduct itself rather than

the happenstance of where the encounter occurred; and (3) the person actually reacted in a manner consistent with being 'seized.'" *United States v. Jordan*, 951 F.2d 1278, 1281 (D.C. Cir. 1991).

It is well-established that not all police conduct is a show of authority sufficient to work a seizure requiring reasonable suspicion. *Florida v. Bostick*, 501 U.S. 429, 432-35 (1991) ("[The police] may generally ask questions to an individual . . . as long as the police do not convey the message that compliance with their requests is required."). A "show of authority" is determined by the totality of the circumstances including, but not limited to facts such as "whether the suspect was physically intimidated or touched, whether the office displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's 'use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.'" *United States v. Wood*, 981 F.3d 536, 539 (D.C. Cir. 1992). In *Wood*, the D.C. Circuit held that there was a seizure where (1) the police were armed and in full uniform; (2) followed Wood at night into a dark apartment building; (3) positioned himself directly behind Wood; and (4) ordered him to "halt right there," "stop." *Id.* at 540. Further, the officer's positioning when he gave the commands significantly restricted Wood's movements. *Id.* ("Webb was so close to Wood when he told him to stop that, by Webb's own admission, Wood had 'nowhere to go.'").

In comparison, in the instant case, the officers were not in uniform and were in unmarked cars. They never displayed any weapons. They met defendant where he was walking as opposed to following him into a building. And Officer Jacobs was still coming out of his car when he said, "Hold on a sec." He was not standing directly in front of or behind Defendant. And defendant had almost all directions to turn and leave. His movements were not restricted at all by Officer Jacobs's positioning. Additionally, the phrase, "Hold on a sec," does not rise to the level of show of authority as the direct command to "Halt right there," and "Stop." In light of the totality of the

circumstances, there was insufficient show of authority for a reasonable person to feel they were free to go. Thus, defendant was not seized when Officer Jacobs's said, "Hold on a sec."

Presuming that there was a sufficient show of authority, the fact that defendant did not submit means that he was not seized.  The Supreme Court of the United States in *California v. Hodari D.*, 499 U.S. 621 (1991) held that even when a reasonable person believed that he was not free to leave pursuant to an officer's command to stop, a defendant may not rely on show of authority if he failed to submit to the officer's assertion of authority. *See also Wood* at 50. Here, defendant continued to move away from the officers after Officer Jacobs said to "Hold on a sec." It was only after Officer Jacobs clearly saw the bulge in plain sight that he commanded defendant to "stop backing away," and defendant stopped moving away. Because defendant failed to submit to Officer Jacobs's statement, "Hold on a sec," there was no seizure until *after* the officers saw the bulge in defendant's waistband.

> *iv. Probable Cause to Arrest Defendant Arose after Discovery of the Firearm during the Pat Down.*

The arrest of defendant was supported by probable cause.  It is axiomatic that the police may arrest someone without first obtaining an arrest warrant where the police have probable cause to believe that person is committing or has committed a criminal offense.  *Florida v. White*, 526 U.S. 559 (1999).  Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience that would lead the officer to believe that a criminal offense had been or is being committed.  *See United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981); *Brinegar v. United States*, 338 U.S. 160 (1949).

In the instant case, the attached BWC footage shows Officer Murrell conducted a brief pat down of the front of defendant's pants, when he immediately felt what he recognized as a firearm

inside defendant's pants. "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'" *United States v. Spriggs,* No. 09-0361, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373–75 (1993)). After recognizing the presence of the gun during the pat down, probable cause existed to place defendant under arrest. Accordingly, the officers had probable cause to arrest defendant for possession of a firearm, and therefore, to conduct a search incident to arrest to recover the firearm found on defendant.

## <u>CONCLUSION</u>

**WHEREFORE** for the reasons stated above the United States respectfully submits that defendant's motion to suppress should be denied.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472-845

By:      _____/s/_____
VIVIAN E. KIM
C.A. Bar No. 303066
Assistant United States Attorney
555 Fourth Street, N.W.,
Washington, D.C. 20530
Telephone: (202) 252-7014
E-mail: Vivian.Kim@usdoj.gov

STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: Steve.Wasserman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 6th day of December, 2019.

_____/s/_____
Vivian E. Kim
Steven B. Wasserman
Assistant United States Attorneys