# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Criminal No. 19-cr-315 (ESH) |
| DESHAWN HOOD, | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

Defendant Deshawn Hood has been charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). On November 22, 2019, Hood moved to suppress evidence seized following the September 16, 2019 police stop that led to his arrest and the charge in this case. (*See* Mot. to Suppress [ECF 19].) He argues that since the police lacked a reasonable, articulable suspicion to suspect him of a crime, the stop violated the Fourth Amendment and any evidence seized as a result must be suppressed. (*See id.*; *see also* Def.'s Supp. Br. [ECF 26].)

An evidentiary hearing and argument were held on this motion on January 10 and 14, 2020. For the reasons stated herein, Hood's motion will be granted, and the evidence seized following his unconstitutional stop will be suppressed.

## FACTUAL BACKGROUND[1]

At approximately 11:30 p.m. on September 16, 2019, officers from the Metropolitan Police Department's Narcotics and Special Investigations Division Gun Recovery Unit ("GRU") were driving in Northeast D.C. According to Officer James Jacobs, who testified at the hearing, the GRU generally travels in groups of two to four cars, and while their vehicles are unmarked, "most people in the neighborhoods [they] patrol know" and are able to identify them as the "guns squad." (Tr. of January 10, 2020 Hearing ("Jan. 10 Tr.").[2]) In this particular instance, the GRU officers were traveling in two unmarked cars. They were patrolling this area because it "has had many sounds of gunshots, violent crimes, as well as shootings and homicides." (*Id.*) While driving northbound on 42nd Street, N.E., the first GRU car—in which Officers Murrell and Joseph were driving—made contact with Hood, who greeted the officers. (*See id.*) According to Officer Jacobs, Hood also said something to the effect that he "was just trying to get home."[3] (*Id.*)

Hood, who was traveling southbound on 42nd Street at the time, continued on his way, making a left turn onto Foote Street, N.E. Officer Jacobs testified that while walking away, Hood looked back at the officers' vehicle. (*See id.*) At that time, one of the officers from the lead car came over the radio and requested that the officers in the second car—Officer Torres, who was driving, and Officer Jacobs in the passenger seat—"speak to him [Hood] real quick."

---

[1] The facts necessary to decide this motion are essentially undisputed. The Court credits Officer James Jacobs' testimony, which is corroborated by footage from his body-worn camera, which captured the entire incident from the moment Officer Jacobs exited his car.

[2] The Court cites to the transcript of the January 10, 2020 hearing but does not include page or line numbers as the transcript is not yet finalized. An updated Memorandum Opinion will be released with page and line numbers once a final transcript has been filed.

[3] Officer Jacobs only learned what Hood said after the fact, when Officer Joseph told him sometime following the arrest. (*See* Jan. 10 Tr.)

(*See id.*; *see also* Gov't Ex. 5 at 55:13 (recording of that radio transmission).) Following that directive, the second car made a right turn onto Foote Street and pulled up next to Hood, who was walking off the sidewalk and entering the street from the north side. Officer Jacobs and Torres' car stopped in the middle of the street, at which point Officer Jacobs activated his body camera and began to quickly exit the car.[4] At this point, Hood had already raised his hands in the air, although he did this without any request by the police. (*See* Jan. 10 Tr.)

Officer Jacobs said "hold on a sec"[5] while gesturing at Hood with his right arm. (*See* Gov't Ex. 1A ("Video") at 2:02.[6]) Although his tone was conversational, he did not explain why he was telling Hood to hold on. (*See* Jan. 10 Tr.) He continued around the front of the police car and approached Hood, whose hands remained in the air. Although Officer Jacobs was wearing a vest with the word "police" prominently displayed on the vest, he did not draw his gun and his partner had not activated the siren or the lights on top of the car. Hood can be heard saying repeatedly that the police "did not have consent to search [him]." (*See* Video at 2:03.) At the same time, outside of the view of the camera, Officer Torres had also exited the vehicle. (*See*

---

[4] When an officer activates his body camera, the camera's software automatically saves the prior two minutes of video, though the footage is silent until the point at which the camera is activated. (*See* Jan. 10 Tr.) Because of this, the Court is able to see the car in which Officer Jacobs was driving make a right turn onto Foote Street and pull up to the right of Hood in the street, but there is no audio until he began to exit the car at approximately two minutes into the recording.

[5] It is unclear whether Officer Jacobs said "hold on" or "hold up," and the parties referred to these two phrasings interchangeably throughout the hearing and their briefs. (*See generally* Jan. 10 Tr.) The parties have made no suggestion that the word choice of "on" versus "up" would be outcome-determinative in this situation, and so the Court simply refers to Officer Jacobs' first words as "hold on a sec" consistently throughout this Memorandum Opinion.

[6] When the Court refers to a time on the body-worn camera footage, it is referring not to the timestamp shown in the upper-right-hand corner of the video—which is in Zulu, and therefore four hours ahead of Eastern time—but to the minute and second position of a particular moment within the video recording the Court was given. For example, this particular citation refers to what happens starting at two minutes and two seconds into the video.

Jan. 10 Tr.) Hood took several steps while Officer Jacobs approached, going several feet further into the middle of the street and in front of the police car. (*See* Video at 2:05.) After taking these several steps, and as the distance between him and Officer Jacobs narrowed, Hood stopped walking and stood still with his hands held in the air. He repeated that Officer Jacobs did not have consent to search him and indicated that he was going to his house. (*See id.* at 2:09.)

Officer Jacobs testified that when he approached Hood, he saw an "abnormally large bulge, which was not consistent with the human anatomy, . . . to the left of [Hood's] groin area in his pants" and the bulge was "very noticeable."[7] (Jan. 10 Tr.) He testified that he believed Officer Torres had also seen the bulge, because "[h]e shined his flashlight on the same area as he[ was] approaching as well, so at that point I knew that we were both on the same page and believed that it was a firearm in Mr. Hood's pants." (*Id.*) At approximately 2:12, Officer Jacobs told Hood—who had taken several steps backwards upon Officer Jacobs' approach—to "stop backing away." (*See* Video at 2:11.)

Officer Jacobs then said, "Let me just ask you about that bulge in the front of your pants." (*See id.* at 2:14.) In response, Hood lowered his arms to his waistband and looked down, at which point Officer Jacobs told him not to reach for his waistband. (*See id.* at 2:15.) Hood told Officer Jacobs that the bulge in the front of his pants was his penis. (*See id.* at 2:17.) He again indicated that his house was right across the street, and Officer Jacobs replied that he understood Hood wanted to go to his house. (*See id.* at 2:19.) At the same time, in the background of Officer Jacobs' video—behind Hood—the first GRU car can be seen going into reverse and making a right turn onto Foote Street.

---

[7] Because Hood was wearing a cropped shirt, which came only several inches down his chest and left the majority of his chest and waist exposed, his waistband and the groin area of his pants were clearly visible to the officers. (*See* Gov't Ex. 4 (still photo from body-worn camera footage showing Hood, facing police officers).)

When Hood again repeated that Officer Jacobs did not have consent to search him, Officer Jacobs responded that he did not want his consent for a search, he just wanted to know what was in the front of Hood's pants. (*See id.* at 2:23.) Hood indicated that he was going to keep walking to his house, and again said that the bulge in his pants was his penis. (*See id.* at 2:26.) At approximately 2:30, several more police officers exited the other GRU vehicle and began walking towards Hood. By 2:38, one of the other officers had walked up and also indicated that they just wanted to know what was in the front of his pants. (*See id.* at 2:38.) By this time, Hood was surrounded by at least five police officers. (*See id.* at 2:45.)

Hood continued backing towards the cars parked on the left side of the street, at which time the officers handcuffed him. (*See id.* at 2:57.) One of the officers (possibly Officer Jacobs) can be heard telling Hood to stop, to which he replied he wasn't doing anything. (*See id.* at 2:58.) At 3:03, a transmission was broadcast over the radio by one of the officers—either Joseph or Murrell—saying "1-800"; at the hearing, Officer Jacobs testified that this is what their squad radioed whenever they found a gun. (*See* Jan. 10 Tr.) When an officer looked into Hood's pants, he identified the gun as a loaded Glock with an extended magazine. (*See* Video at 3:50.)

**ANALYSIS**

**I.    LEGAL STANDARDS**

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "But not all interactions between police officers and citizens amount to a 'seizure' for Fourth Amendment purposes." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015).

An individual is seized only when an "officer, by means of physical force or show of authority, has in some way restrained [his] liberty." *Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968). "Whether police action amounts to a 'show of authority' requires a court to ask whether a

'reasonable person' 'in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave.'" *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)). Factors a court must consider in deciding whether the action was a show of authority include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The D.C. Circuit has also suggested that courts consider "the demeanor of the approaching officer, whether the officer . . . wore a uniform, and the time and place of the encounter." *United States v. Goddard*, 491 F.3d 537, 460 (D.C. Cir. 2007) (internal quotation marks and citations omitted). The test here is not what the particular person seized thought about the encounter, but what "a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *Id*. As a result, "neither the subjective impressions of the defendant nor the subjective intentions of the officer determine whether a seizure has occurred." *Id.*

Once it has been determined that an individual was seized, a court must assess whether the police had constitutional justification for doing so. Under the law announced by the Supreme Court in *Terry v. Ohio*, a police officer may stop an individual "even if the officer lacks probable cause." *United States v. Smith*, 373 F. Supp. 3d 223, 236 (D.D.C. 2019) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Nevertheless, the stop must still "be founded upon reasonable, objective justification." *Gross*, 784 F.3d at 786. If an officer has "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" he may conduct a brief, investigatory stop. *Sokolow*, 490 U.S. at 7. In determining whether an officer had reasonable suspicion for a *Terry* stop, a court gives weight not to an officer's "inchoate and

6

unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

"When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *Smith*, 373 F. Supp. 3d at 236 (internal quotation marks omitted). While generally the defendant bears the burden of proving he was subjected to an unconstitutional search or seizure, when he is seized or searched without a warrant, as is the case here, "the burden shifts to the government to justify the warrantless arrest or search." *Id.* (internal quotation marks omitted).

## II. HOOD WAS SEIZED WHEN OFFICER JACOBS TOLD HIM TO "HOLD ON A SEC"

The narrow issue in dispute is when did the police seize Hood. Hood argues that "[t]he officers' initial interaction with Mr. Hood was so overpowering" that he was seized at the time Officers Jacobs and Torres exited their vehicle and Officer Jacobs told him to "hold on a sec." (*See* Def. Mot. at 4.) The government, on the other hand, argues that Hood was not seized until, at the earliest, Officer Jacobs told Hood to "stop backing away" and Hood stopped. (*See* Gov't Supp. Br. at 1 [ECF 25].)

The Court acknowledges that this is an extremely close question. As noted above, a seizure occurs as a result of a "show of authority," when "a reasonable person would not have believed he was free to leave." *United States v. Gibson*, 366 F. Supp. 3d 14, 28 (D.D.C. 2018). Like *Gibson*, another decision from this Court, the officers engaging Hood were "in an unmarked vehicle late at night while wearing tactical vests." *Id.* They quickly exited their vehicle, with guns and handcuffs showing and wearing identifiable MPD vests and badges. (*See* Jan. 10 Tr.) Furthermore, Officer Torres shone a flashlight at Hood upon exiting his car, the use of which was also deemed probative in *Gibson*. *See Gibson*, 366 F. Supp. 3d at 28 (finding a seizure when

7

a police vehicle "pulled up next to [the defendant], . . . immediately shined a bright flashlight at him, and issued two, successive directives"). And Officer Jacobs is gesturing with his arms at Hood from the moment he exits the car, although he did not touch the defendant or restrict his movement. (*See* Video at 2:02.)

The characterization of the language used by Officer Jacobs is significant. It is well-settled that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). However, Officer Jacobs' initial statement to Hood was *not* phrased as a question or a request, but as a statement. And there is little discernable difference between the phrase "hold on a sec" and "stop"—both command that the target stop moving. The Court recognizes that Officer Jacobs' tone when he said "hold on a sec" was conversational. (*See* Video at 2:02.) But Officer Jacobs' words to Hood—as he was being approached late at night by two armed police officers—conveyed the message that Hood was not free to leave. While Officer Jacobs testified at the hearing that he had only been instructed to "speak to [Hood] real quick," an innocent individual told to "hold on a sec" by the police late at night, on a residential street, would conclude that he could not walk away. *See United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir. 1992) ("When [the officer] told Wood to stop, he was not extending a greeting or positing a question; rather, he was giving an order in 'language . . . indicating that compliance . . . might be compelled.'" (quoting *Mendenhall*, 446 U.S. at 554)). Here too, the totality of the circumstances supports a finding that compliance was required, and a reasonable person in this situation would not have believed he was free to leave. *See Mendenhall*, 446 U.S. at 554 (requiring a court to assess "in view of all of the circumstances surrounding the incident, [whether] a reasonable person would have

believed that he was not free to leave"). As observed by Circuit Judge Janice Rogers Brown when describing the *modus operandi* of the Gun Recovery Unit,

> "[R]ather than rely upon particularized suspicions in the first instance, the District maximizes its odds of illegal firearm recovery by patrolling high crime neighborhoods 'looking for guns,' or more accurately, looking for people likely to have guns. But playing the odds is not the same thing as reasonable suspicion."

*Gross*, 784 F.3d at 789 (Brown, J., concurring) (citations omitted).

The government argues in the alternative that if "hold on a sec" constituted a "show of authority," Hood cannot rely on that show of authority because he did not submit. (*See* Gov't Supp. Br. at 3 (citing *California v. Hodari D.*, 499 U.S. 621 (1991)).) The Court rejects this line of attack based on its review of Officer Jacobs' body-worn camera footage. While Hood took several steps after being told to "hold on a sec," he clearly stopped and turned to face the officers almost immediately after Jacobs' first statement. Prior to being stopped, he was crossing from the north to the south side of Foote Street, and by the time he stopped walking he was still in front of the police car, which had stopped in the right lane of traffic. (*See* Video at 2:02–2:12.) Upon Officer Jacobs' approach, Hood took another several steps back, but after Officer Jacobs' command to "stop backing away," he promptly stopped. (*See id.* at 2:10–2:14.)

These several steps are insufficient to constitute a refusal to submit to the officers' show of authority. It is not equivalent, for example, to the headlong flight that is described as the paradigm of non-submissiveness in *California v. Hodari D. See* 499 U.S. at 626 ("[The word 'seizure'] does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure."). Considering the totality of the circumstances, the Court concludes that Hood's actions are consistent with those of an individual who understood himself to be unable to leave. *See Castle*, 825 F.3d at 634 (concluding that defendant who walked further after being told to "hold on" by a police officer

9

was nonetheless seized, as he was still "exhibit[ing] complete submission"); *see also Brendlin v. California*, 551 U.S. 249, 262 (2007) ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.").

### III. THE POLICE DID NOT HAVE REASONABLE SUSPICION AT THE TIME OF HOOD'S SEIZURE

Having concluded that Hood was seized for Fourth Amendment purposes at the time Officer Jacobs told him to "hold on a sec," the Court must now decide whether, at that time, the officers had a reasonable, articulable suspicion that Hood was engaged in criminal activity. The Court concludes they did not.

Officer Jacobs told Hood to "hold on a sec" while he was exiting the passenger side of the police vehicle; it was not until several seconds later that the officers observed the bulge in Hood's pants, which the Court agrees would have provided sufficient support for a finding of reasonable suspicion. According to the government, however, there was nonetheless reasonable suspicion *before* that time based on the following facts: "the defendant was walking around in a high crime area, blading his body away from the view of officers, while putting his hands up unsolicited." (Gov't Supp. Br. at 4.) Upon review of the body-worn camera footage, the Court cannot agree with this characterization. First, it does not appear that Hood was in fact "blading" his body away, at least not at the time Officer Jacobs stopped him. (*See* Video at 2:02.) To the contrary, the positioning of his body seems consistent with an individual who was crossing a street at a diagonal from north to south. Next, the street on which Hood was walking was residential; it was also the street on which he lived. Although the "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), this factor cannot bear the weight the government

10

assigns it.  Lastly, Hood's decision to put his hands up unsolicited is hardly surprising, given how the GRU operates in neighborhoods such as his—*i.e.*, essentially as a "rolling roadblock," *see Gross*, 784 F.3d at 789 (Brown, J., concurring), trawling the streets and asking to see individual's waistbands.  *See, e.g., Gibson*, 366 F. Supp. 3d at 24 (describing how, at the direction of the GRU, defendant "raise[d] both hands in the air with his palms facing the MPD officers at about head height"); *see also United States v. Meekins*, 2019 WL 3802944, at *1 (D.D.C. Aug. 13, 2019) (officers drove up next to defendant and said "Do you mind showing me your waistband?"); *United States v. Jones*, 142 F. Supp. 3d 49, 53 (D.D.C. 2015) (officer approached and asked men if they had weapons, then "asked if he could see the men's waistbands").

Other factors suggested by the government do not alter this conclusion.  For example, the government—citing *Wardlow*—argues that "an 'act of evasion[]' [is] 'certainly suggestive' of criminal activity."  (Gov't Supp. Br. at 4.)  However, there is no evidence that Hood attempted to evade the officers, nor are there any furtive gestures, two telltale signs used by the police to justify a stop.  And while the government cites the "late hour" (*id.* at 5), the Court cannot conclude that the hour (11:30 p.m.) is suggestive of criminality.  Lastly, although Hood's choice to "say without any prompting that he was going home" upon his first encounter with the police (*id.* at 4) may not be typical, Officer Jacobs did not know at the time Hood was seized what exactly Hood had told the officers in the other car.  No officer had seen the bulge when Office Jacobs told Hood to "hold on a sec" and he had not done anything to give the officers a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Sokolow*, 490 U.S. at 7.  For these reasons, the Court concludes that Hood's seizure was unlawful.

## IV. THE DOCTRINE OF INEVITABLE DISCOVERY DOES NOT APPLY

Lastly, the government argues that "even if the Court finds that there was an unlawful seizure at the time that Officer Jacobs' said, 'Hold [on] a sec,' the discovery of the bulge did not rely on the seizure," because Officer Jacobs would have seen the bulge regardless. (Gov't Supp. Br. at 5.) Based on its own review of the body-worn camera footage, the Court again disagrees. As noted above, at the time Officer Jacobs exited the police car, Hood was walking diagonally from the north to the south side of Foote Street; if Officer Jacobs had not told Hood to "hold on a sec," and Hood had not been forced to stop, it is unclear how Officer Jacobs would have seen the bulge in the front of Hood's pants. "To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that, even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway." *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007). Furthermore, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts." *Id.* It is speculation to assume that, had Hood not been seized, he would have stopped in the middle of the street such that Officer Jacobs could have seen the bulge in the front of his sweatpants, especially given the direction in which Hood was walking.

## CONCLUSION

For the foregoing reasons, the Court concludes that (1) the police "seized" Hood, for purposes of the Fourth Amendment, when Officer Jacobs told him to "hold on a sec"; (2) at that time, the GRU officers lacked any articulable, reasonable suspicion of wrongdoing; and (3) the doctrine of inevitable discovery does not apply. As a result, the Court concludes that the government has not met its burden to show that the police did not violate Hood's Fourth

Amendment rights, and therefore, all evidence resulting from Hood's seizure must be suppressed.  A separate Order accompanies this Memorandum Opinion.



                                                    ELLEN S. HUVELLE
                                                    United States District Judge

Date: January 21, 2020