```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      )  Criminal Action
                                     )  No. 19-cr-315
 4                     Plaintiff,    )
                                     )  MOTION HEARING
 5    vs.                            )  Day 1 of 2
                                     )
 6    DeShawn Hood,                  )  Washington, DC
                                     )  January 10, 2020
 7                     Defendant.    )  Time:  10:30 a.m.
      _____
 8
                     TRANSCRIPT OF MOTION HEARING
 9                          HELD BEFORE
            THE HONORABLE JUDGE ELLEN SEGAL HUVELLE
10               UNITED STATES DISTRICT JUDGE
      _____
11
                    A P P E A R A N C E S
12
      For the Plaintiff:       Vivian Kim
13                             Steven B. Wasserman
                               U.S. Attorney's Office for the
14                                District of Columbia
                               555 Fourth Street, NW
15                             Washington, DC  20530
                               (202) 252-7014
16                             Email:  Vivian.kim@usdoj.gov
                               Email:  Steve.wasserman@usdoj.gov
17

18    For the Defendant:       Michael Edward Lawlor
                               Brennan, McKenna & Lawlor, Chartered
19                             6305 Ivy Lane, Suite 700
                               Greenbelt, MD  20770
20                             (301) 474-5730
                               Email:  Mlawlor@verizon.net
21

22    _____

23    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
24                             United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
25                             Washington, DC  20001
                               202-354-3267
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this morning, this
 2    is the matter of United States of America versus DeShawn Hood.
 3    This is criminal record 19-315.
 4              Ask the parties step forward, identify yourselves for
 5    the record, please.
 6              MS. KIM:  Vivian Kim and Steven Wasserman for the
 7    United States.
 8              THE COURT:  Good morning.
 9              MR. LAWLOR:  Good morning, Your Honor.  Michael
10    Lawlor for Mr. Hood.
11              THE COURT:  Okay.  I understand, Ms. Kim, there's a
12    problem?
13              MS. KIM:  Yes, Your Honor.  We'll be asking for a
14    continuance into next week, which defense has agreed to.  What
15    had happened is that we had received a radio run from the MPD,
16    which we had believed was complete, but when we met with our
17    officer two days ago, he expressed that he believed there was
18    more to the recording, prior to what we had received.
19              THE COURT:  When was the radio run?
20              MS. KIM:  I'm sorry?
21              THE COURT:  When was the radio run?
22              MS. KIM:  From the date of the incident, Your Honor.
23              THE COURT:  No, I understand that.  But had they
24    already put him in handcuffs and then they called?
25              MS. KIM:  No, this is prior to.  So what we
```

1    believe was -- I'm sorry.

2              THE COURT:  Do you have your witnesses here?

3              MS. KIM:  I do have my witness here, yes, Your Honor.

4              THE COURT:  Mr. Lawlor, I don't -- we can get the

5    radio run, but I have no time to hold an evidentiary hearing.

6    I made that clear before.  We're going to take the witnesses

7    and you can listen to the radio -- have you heard it yet?

8              MR. LAWLOR:  Your Honor, I understand what you're

9    saying, but I -- Mr. Hood, I'll tell you this candidly --

10             THE COURT:  I'm going to hear the witnesses.

11             MR. LAWLOR:  Your Honor, I'm going to ask you not

12   to --

13             THE COURT:  I have no time to hear this.  What do you

14   want me to do?  Mr. Hood deserves a hearing.

15             MR. LAWLOR:  I agree.

16             THE COURT:  And I'm gone for February.

17             MR. LAWLOR:  But we just -- and maybe Your Honor has

18   other information, but we just asked the courtroom deputy and

19   he indicated you could do this on Thursday.

20             THE COURT:  No, he doesn't know my schedule.

21             MR. LAWLOR:  All right.  Well, Your Honor, this is

22   not -- this is a dispositive motion.

23             THE COURT:  I understand that.

24             MR. LAWLOR:  And the whole issue here -- in fact, I'm

25   sort of telling anybody anything they don't know -- is, you

1    know, is what was the information that the officers had prior

2    to making contact with Mr. Hood?  Not only has the government

3    indicated that there's a radio run that I don't have,

4    but apparently there's discussion --

5              THE COURT:  I'm ready to grant your motion.  That's

6    unbelievable for the government.  Unbelievable.  I made it

7    clear --

8              MR. LAWLOR:  In that case we're ready to go, Your

9    Honor.

10             THE COURT:  What?  Yeah, right.

11             MR. LAWLOR:  In that case we're ready.

12             THE COURT:  You know, what do you have?  Have you

13   given them what you have?

14             MS. KIM:  We did, Your Honor.  And there is mention

15   of the incident on what we have, which is why we were not aware

16   of anything that happened prior to that until we listened to

17   the radio run and realized there was something prior to that

18   that may have been missing.

19             THE COURT:  Why can't you get it over here?

20             MS. KIM:  The moment we found out we requested it

21   straight from the AAOC, they have been working on it since, and

22   we received something this morning.  What we received this

23   morning was only ten seconds additional, not the several

24   minutes that we requested.  So it did not capture what we

25   believed to be on the recording.  And so we went back to them,

1    asked them to expand their search parameters to get more of the

2    recording for us, and unfortunately they were not able to get

3    it to us before the hearing.

4         THE COURT:  But can they get it to us soon?  Who's

5    going to testify and how many witnesses do you have?

6         MS. KIM:  We have --

7         THE COURT:  You know, this is, from my point of view,

8    impossible.  And I'm sure Mr. Hood feels the same way.  You

9    know, you just can't expect -- I made it clear I was leaving

10   town.  I have an MDL and then I'm leaving, so we have to do it

11   now.  I don't have any extra time.  He's even not my courtroom

12   clerk, so he doesn't know my schedule.

13        Can you call over and find out if they can get it to

14   us by right after lunch?

15        MS. KIM:  I spoke to them and they said they could

16   get it to us today.  I can see if I can get a time certain,

17   Your Honor.

18        THE COURT:  I want it in an hour.  What's the

19   problem?

20        MR. LAWLOR:  Your Honor, I have another hearing in

21   another county, another jurisdiction, at 2:30, so I can't -- I

22   mean, I could perhaps, with Your Honor's assistance, but that's

23   a murder case, set for trial in a week, so I can't really be

24   here in the afternoon.

25        THE COURT:  It seems to me there are witnesses that,

 1    before any radio run, we can hear from them.  They saw a lot of

 2    things before there was a radio run.  Do you know what time the

 3    radio run was?

 4         MS. KIM:  So, Your Honor, to make it clear to the

 5    Court, is that what we believe is on this radio run that's

 6    missing, is that there's an initial contact with an initial car

 7    where the defendant said hello to the initial car.  The initial

 8    call over the radio informed our witness and the other car to

 9    make contact with the defendant based on what they believed to

10    be suspicious behavior.  We're not exactly sure of the exact

11    wording.  However, that is what we expect to be on the

12    recording.  We're also unsure as to whether our witness

13    responded.  If he did, it would be along the lines of

14    confirming that he would make contact.

15         THE COURT:  Is there any witness who testifies about

16    things before this happens?  Before this radio run?

17         MS. KIM:  No, Your Honor.

18         THE COURT:  Get the radio run here within the hour.

19    Call them up.  This is inexcusable.  People's schedule doesn't

20    depend on you figuring out you have witnesses and you don't

21    have the stuff ready.

22         In the meantime, though, I want you to put the direct

23    on.  Mr. Lawlor won't have to cross-examine anybody until we

24    get the radio run.  Okay, Mr. Lawlor?  But I can hear the

25    direct.

1          MR. LAWLOR:  That's fine, Your Honor.

2          MS. KIM:  That's fine, Your Honor.

3          THE COURT:  Make your call, Mr. Wasserman.  You tell

4     them the Court wants it here within the hour.

5          I don't know why you didn't have this before now.

6     Has he heard any of the radio run?

7          MR. WASSERMAN:  Your Honor, the radio run was

8     provided months ago.

9          THE COURT:  Right.  So we're looking for a couple of

10    minutes, maybe.

11         MR. WASSERMAN:  Right.  And, you know, as Ms. Kim

12    represented, you know, unfortunately we were not aware that

13    there were potential recordings prior to what we had until the

14    officer was spoken to.  So, it is unfortunate, but, you know,

15    there wasn't really a whole lot we could do about it.

16         THE COURT:  Yeah, you could be better prepared.

17         MR. WASSERMAN:  I understand the Court --

18         THE COURT:  When do you find out --

19         MR. WASSERMAN:  I understand the Court's frustration.

20         THE COURT:  You know, I owe him a hearing.

21         MR. WASSERMAN:  Absolutely.

22         THE COURT:  And the days are numbered.  I have

23    stuffed everything in the last two weeks; everything.

24         MR. WASSERMAN:  I understand and I appreciate that.

25         THE COURT:  It's one initial call before.  In the

```
1    meantime, we're going to hear your first witness on direct.
2    We'll hear the evidence.
3              MR. WASSERMAN:  Very well, Your Honor.
4              THE COURT:  He'll wait on cross, if he has to.
5              Mr. Lawlor, that's the best we can do.
6              MR. LAWLOR:  Yes, Your Honor.
7              THE COURT:  Mr. Hood, we're trying our best here.
8              THE DEFENDANT:  I understand, Your Honor.
9              THE COURT:  Ha?
10             THE DEFENDANT:  I understand, Your Honor.
11             THE COURT:  Okay.  How many witnesses does the
12   government have?
13             MR. WASSERMAN:  Just one, Your Honor.
14             THE COURT:  Who is that?
15             MS. KIM:  James Jacobs.
16             THE COURT:  Is he on the radio run?
17             MS. KIM:  He has heard what we have.  He does not
18   have what was, obviously, not provided yet.
19             THE COURT:  By the time we finish you're not going to
20   have it, I imagine.
21             Whatever we don't finish we can take up at the end of
22   the day on Tuesday.  I have to go to a funeral.
23             Mr. Lawlor, are you around on the 14th?
24             MR. LAWLOR:  I'll make myself, Your Honor.
25             THE COURT:  Only at the end of the day.  The funeral
```

1    is in the morning.

2            MR. LAWLOR:  I have a 3 o'clock plea with Judge

3    Hogan.  So, maybe I can move that up to 2 and we can start at

4    3, or start at 4?

5            THE COURT:  Not at 4.  I'll be back by 3.  Or 2.  See

6    what you -- well, let's see where we go at the end of this.  We

7    may be waiting for something that doesn't exist.

8            Okay.  Get your witness in here.

9            MS. KIM:  Your Honor, the government calls Officer

10   James Jacobs.

11           THE COURT:  Have you turned over the *Jencks* material

12   on Officer Jacobs?

13           MS. KIM:  Yes, we have.  The only thing that remains,

14   obviously, is the radio run.

15                       JAMES JACOBS,

16   was called as a witness and, having been first duly sworn, was

17   examined and testified as follows:

18                    DIRECT EXAMINATION

19   BY MS. KIM:

20   Q.  Good morning, Officer.  If you could state and spell your

21   name for the record?

22   A.  Good morning.  Officer James Jacobs, J-A-M-E-S,

23   J-A-C-O-B-S.

24   Q.  And, Officer Jacobs, where do you work?

25   A.  The Metropolitan Police Department.

1    Q.  For how long have you worked with the Metropolitan Police

2    Department?

3    A.  About six and a half to seven years.

4    Q.  And where do you work currently?

5    A.  I'm a member of the gun recovery unit.

6    Q.  What does the gun recovery unit do?

7    A.  We recover and investigate illegal firearm activity in the

8    District of Columbia.

9    Q.  And in what type of areas do you patrol?

10   A.  Typically areas that experience gun violence, sounds of

11   gunshots and homicides, violent crimes.

12   Q.  How long have you been with the gun recovery unit?

13   A.  I believe about five months at this point.

14   Q.  And in five months can you approximate about how many

15   firearms you have seized?

16   A.  I know for the previous year we seized roughly 600

17   firearms.

18   Q.  And you were in that -- you were there for part of the

19   months, but not the full year?

20   A.  About half the time, yes.

21   Q.  How about you personally, do you know how many -- if you

22   can approximate guns that have been recovered while you were

23   present?

24   A.  Throughout my career, I've been present for at least over

25   100 gun recoveries.

1    Q.  So based on your training and experience, what are some of

2    the behaviors --

3                THE COURT:  One hundred gun recoveries in five

4    months, is that what you're talking?

5                THE WITNESS:  I said throughout my career I've been

6    present for those.

7                THE COURT:  And how many as part of the gun recovery

8    unit?

9                THE WITNESS:  I don't know the exact number, but to

10   be safe, I would say I've been present for about 30, probably.

11               THE COURT:  Okay.

12   BY MS. KIM:

13   Q.  What are some of the behaviors that you look for when

14   you're investigating the possibility that someone may be in

15   possession of a firearm?

16               MR. LAWLOR:  Objection, Your Honor.

17               THE COURT:  What's the basis?

18               MR. LAWLOR:  Your Honor, we're concerned with

19   reasonable and articulable suspicion vis-à-vis Mr. Hood, not

20   the general parameters of criminal activity on unrelated days.

21               THE COURT:  Sustained.  Go ahead.

22   BY MS. KIM:

23   Q.  Let's turn our attention to September 16 of 2019, at

24   approximately 11:30 p.m.  Were you around the 4200 block of

25   Foote Street Northeast?

1    A.  Yes.

2    Q.  Why were you there that evening?

3    A.  My coworkers and I were making our way back to the station

4    from a gun recovery.

5    Q.  How would you describe the area of the 4200 block of Foote

6    Street Northeast?

7              THE COURT:  4200?

8              MS. KIM:  4200.

9              THE WITNESS:  It's an area that we've spent some time

10   in since I've been with the gun recovery unit.  It's had --

11   that area, that district has had many sounds of gunshots,

12   violent crimes, as well as shootings and homicides.

13             MR. LAWLOR:  Objection, Your Honor.

14             THE COURT:  Overruled.

15   BY MS. KIM:

16   Q.  And on September 16th of 2019, at around 11:30 p.m., who

17   were you working with?

18   A.  I was riding in the vehicle with Officer Torres.  And the

19   vehicle in front of us had Officer Murrell and Officer Joseph

20   driving it.

21             THE COURT:  Okay.  Hold up one minute.  Murrell and

22   Joseph were in the vehicle in front of you?

23             THE WITNESS:  Yes.  I believe Officer Murrell was

24   driving and Officer Joseph was the passenger.

25             THE COURT:  Was this marked or unmarked?

1          THE WITNESS:  Both vehicles are unmarked.

2          THE COURT:  And you're with Torres?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And who's driving?

5          THE WITNESS:  Officer Torres.

6          THE COURT:  And you're in the passenger seat?

7          THE WITNESS:  Yes.

8          THE COURT:  And no one in the back seat?

9          THE WITNESS:  No.

10    BY MS. KIM:

11    Q.  To the best of your recollection, was there anyone else in

12    the car with Officer Murrell and Officer -- I'm sorry?

13    A.  Joseph.

14    Q.  Joseph.

15    A.  I don't believe so.  I know some other officers were on

16    scene later in the arrest.  But I believe it was just those

17    two, I'm not 100 percent sure.

18    Q.  And how were you dressed that evening?

19    A.  We were wearing plain clothes, with -- each of us had a tac

20    vest on with police identifiers.

21    Q.  And approximately 11:30 p.m., can you describe where you

22    were and what you saw?

23    A.  We were traveling on 42nd Street and I saw Officer Murrell

24    and Joseph's car pause and speak with an individual on the

25    street as they were driving ahead of us.

1    Q.  And do you see that individual in the courtroom today?

2    A.  Yes.

3    Q.  Can you please describe where he is seated and what he is

4    wearing?

5    A.  The gentleman to my left with the orange shirt on.

6            MS. KIM:  Identifying for the record, Your Honor, the

7    defendant.

8            THE COURT:  Yes.  He's identified the defendant.

9            So what side of the street are they on and what side

10   of the street is the person you've just identified?

11           THE WITNESS:  The right side of the street.

12           THE COURT:  The police officers are driving down,

13   meaning the passenger is towards the curb?

14           THE WITNESS:  Yes.

15           THE COURT:  And where is the individual that you saw?

16           THE WITNESS:  He is to the passenger's right and

17   ahead of me.  He's on the passenger's side.

18   BY MS. KIM:

19   Q.  So to be clear, is the defendant closer to the car in front

20   of you or to the car that you are currently in?

21   A.  The car in front of me.

22   Q.  And what, if anything, happened at that time?

23   A.  They had a brief conversation.  I believe the defendant

24   greeted them, they said something to the effect of hello back.

25   He stated that he was just trying to go home, and then walked

1    away from their vehicle.

2    Q.  And what happened then?

3              THE COURT:  Could you hear them?

4              THE WITNESS:  No.

5              THE COURT:  Well, how are you able to testify to what

6    you just testified to?

7              THE WITNESS:  Officer Joseph told me.

8              THE COURT:  Afterwards?

9              THE WITNESS:  Yes.

10              THE COURT:  Okay.

11    BY MS. KIM:

12    Q.  And then what happened?

13    A.  Myself and Officer Torres, we were further back, and we

14    observed the defendant walking away from the vehicle and look

15    back at their vehicle as he was walking away.  And at this

16    point Officers Murrell and Joseph came over the radio and

17    advised us to contact Mr. Hood.

18              THE COURT:  Contact Mr. Hood?  Tell us where

19    Mr. Hood's walking.  I don't quite get what you're saying.

20              THE WITNESS:  So we were on 42nd Street, and Foote

21    Street comes perpendicular to it.  So at this point he was

22    walking -- he had made his way onto Foote, the 4200 block of

23    Foote Street.

24    BY MS. KIM:

25    Q.  Did he make a right or left onto Foote Street?

1    A.  He made a left.

2    Q.  So at that point is it fair to say the defendant is no

3    longer in front of or near the other car?

4    A.  No -- or, yes, that is fair to say, that he's not by their

5    vehicle.

6              THE COURT:  To make the left, did he have to walk in

7    front of one of the police cars?

8              THE WITNESS:  We were still further back, so he

9    walked past their vehicle and then made the left, basically in

10   between where the two police vehicles were.

11             THE COURT:  Okay.  So he's now walking between the

12   two vehicles.

13   BY MS. KIM:

14   Q.  After receiving that radio, what did you do?

15   A.  We made a right onto the 4200 block of Foote Street and

16   attempted to contact Mr. Hood.

17   Q.  Who was the -- I'm sorry.  Prior to contacting Mr. Hood,

18   what, if anything, did you see from the car?

19   A.  We observed him walking away from Officer Murrell and

20   Officer Joseph's vehicle.  We observed him look back at the

21   vehicle and then he was walking on the side of the street as we

22   approached him.

23   Q.  How did he appear as he was walking on the side of the

24   street?

25   A.  He was walking briskly away from the police vehicles.

1    Q.  At some point did he put his hands up in the air?

2    A.  Yes.

3    Q.  Was that before or after you got out of the car?

4    A.  That was before.

5              THE COURT:  One second.  Let me understand this.  You

6    said you took a right on Foote Street?

7              THE WITNESS:  Yes.

8              THE COURT:  So if you're going right on Foote, he's

9    going left on Foote?

10             THE WITNESS:  If I can show you --

11             THE COURT:  Why don't you draw it on a piece of

12   paper?  Doesn't have to be to scale.  The way I heard you, you

13   have one person going right and the other one going left.

14             MS. KIM:  May I approach the witness, Your Honor.

15             THE COURT:  Yes.  Mark this as Government's 1.  Do

16   you have other exhibits?

17             MS. KIM:  We do.  We'll mark it as Government's

18   Exhibit 10.

19             THE COURT:  Ten.  Okay.  Just show us, first, the

20   relationship between Foote and 42nd.

21             THE WITNESS:  Okay.

22             MS. KIM:  Thank you.

23   BY MS. KIM:

24   Q.  I'm putting on the Elmo what has been marked as

25   Government's Exhibit 10.

```
 1      A.  So the -- Mr. Hood -- or, I'm sorry, would you like me to
 2      explain it now?
 3      Q.  Yes, you can continue.
 4              THE COURT:  You might need the sketch here.
 5              MS. KIM:  You can draw, using your finger on the
 6      screen.
 7              THE COURT:  So which way is north, south?
 8              THE WITNESS:  I'm not 100 percent sure without
 9      looking at a map.
10              THE COURT:  Okay.  All right.
11      BY MS. KIM:
12      Q.  Go ahead.
13      A.  So, Mr. Hood was walking around here and Officer Murrell
14      and Joseph's vehicle was around here, past Foote Street.
15      Myself and Officer Torres' vehicle was somewhere roughly in
16      this area, so we were not at Foote Street yet.  (Indicating.)
17              THE COURT:  Okay.  So you have to mark -- the first
18      little dot represents the defendant?
19              THE WITNESS:  Yes.
20              THE COURT:  The second to the left --
21              MS. KIM:  Would it be fair to say that's the
22      defendant and that this --
23              THE COURT:  Is --
24              MS. KIM:  The first car.
25              THE COURT:  Murrell's car.
```

1       MS. KIM:  Marked with an A, is that correct?

2       THE WITNESS:  Yes.

3       THE COURT:  And then Torres' car is behind?

4       THE WITNESS:  Right.

5       THE COURT:  And you haven't crossed the intersection?

6       THE WITNESS:  Correct.

7       THE COURT:  Okay.  Go ahead.

8       THE WITNESS:  So, our vehicles were traveling in this

9   direction down the street, and the defendant was walking in

10   this direction.  So when he made a left onto Foote Street, he

11   came this way.  And when we made a right onto Foote Street, we

12   came this way.  So we were both traveling the same direction at

13   that point.  (Indicating.)

14       THE COURT:  So you're turning right onto Foote and

15   he's turning left.  He's on the sidewalk or on the street?

16       THE WITNESS:  I believe initially he crosses around

17   this way, where the sidewalk area is.  When I make contact with

18   him, he's just in the side of the street.

19       THE COURT:  He's in the street, in other words?

20       THE WITNESS:  Yes.

21       THE COURT:  Near the curb?

22       THE WITNESS:  I believe there may be a car right

23   here, between the curb and the street where he's walking, but

24   he's in the street.

25       THE COURT:  And you're next to the sidewalk?  You.

1          THE WITNESS:  We're driving in the, like, regular

2     travel lane here.  I get out of the vehicle and walk towards

3     the side that Mr. Hood is walking on.

4          THE COURT:  So do you cross in front of your car or

5     behind?

6          THE WITNESS:  In front of my vehicle.

7          THE COURT:  Okay.

8     BY MS. KIM:

9     Q.  As you're driving, do you have your headlights -- I'm

10    sorry, as Officer Torres is driving, does he have his

11    headlights on?

12    A.  It's dark out at this point, so, yes, I believe our running

13    lights were on.

14    Q.  So can you see the defendant from were you were seated?

15    A.  Yes.

16    Q.  And you said his arms were up, is that correct?

17    A.  Yes.

18    Q.  Is there anything else that you noticed about him?

19    A.  He had, like, a crop top on, which exposed his waistband

20    and stomach area.

21         THE COURT:  Did anyone ask him to raise his arms?

22         THE WITNESS:  No.

23    BY MS. KIM:

24    Q.  And based on your training and experience, what did you

25    make of his conduct of having his hands in -- his arms in the

1  air, unsolicited?

2  A.  This raised a red flag for me, and I -- at that point, when

3  I saw his hands raised, in my training and experience, people

4  typically try to distance themselves from any contraband that

5  they may have.  So when I saw him raise his hands, as someone

6  who is typically looking for guns and making sure people aren't

7  armed, I looked at his waistband area.

8  Q.  Now, was this before or after you got out of the car?

9  A.  Both, I would say.

10        THE COURT:  What do you mean?  What did you see while

11  you were in the car?

12        THE WITNESS:  I continued to -- the way he was

13  walking, he was kind of blading one part of his body away from

14  me, which is another red flag that I had.  So I continued to

15  look at his waistband area while I was approaching him, so that

16  I could get a full view as he turned.

17  BY MS. KIM:

18  Q.  When you got out of the car, was there anyone else who was

19  outside of the car with you?

20  A.  No, not at that point.

21  Q.  Were you armed?

22  A.  Yes.

23  Q.  Did you have your firearm out?

24  A.  No.

25  Q.  And at that point was the other car present on the 4200

1    block of Foote?

2    A.  I believe the other car was still around the initial area,

3    but eventually they did -- those members did come towards where

4    we contacted Mr. Hood.

5    Q.  At the time that you exited the car, were they present?

6    A.  No.

7    Q.  And did your car in any way block Mr. Hood from the

8    direction he was walking?

9    A.  No.

10   Q.  Have you had a chance to review your body-worn camera

11   footage from that evening?

12   A.  Yes.

13   Q.  All right.

14          MS. KIM:  Court's indulgence, Your Honor.

15          THE COURT:  Had you said anything to him by this

16   point?

17          THE WITNESS:  As we were slowing down, I believe

18   Officer Torres greeted him.  And I had not said anything yet.

19   And Mr. Hood actually spoke to me when I got out of the

20   vehicle, before I could say anything to him.

21          THE COURT:  And what did he say?

22          THE WITNESS:  I believe he said:  You do not have

23   consent to search me, as his hands were raised in the air.

24   BY MS. KIM:

25   Q.  Did you ask him anything about that at that time?

1    A.  I mean, that's another red flag that I had because I had

2    not even mentioned anything about a search, I had not asked him

3    any questions, and he's already, before I can even get a

4    greeting out, telling me you cannot search me.

5            THE COURT:  But he has that right.

6            THE WITNESS:  Yes.

7            THE COURT:  And he has the right at this point in

8    time to walk away.

9            THE WITNESS:  Yes.  And typically people do express

10   that they do not want to be searched when I ask them, May I

11   search you?  But typically I would get a greeting out first:

12   How you doing?  May I talk to you for a moment?  I'm Officer

13   Jacobs with Metropolitan Police Department.  I was unable to

14   get any of that out before Mr. Hood told me I do not have his

15   consent to search him.

16   BY MS. KIM:

17   Q.  So showing you what's been marked as Government's Exhibit

18   1A -- playing just a brief part of it, the first couple

19   seconds.

20           (Playing video.)

21           Do you recognize that?

22   A.  Yes.

23   Q.  If we can pause the video.

24           What is that?

25   A.  That's my body camera video from that night.

1    Q.  Is it a fair and accurate representation of what was

2    captured on your body-worn camera on September 16th of 2019, at

3    around 11:30 p.m.?

4    A.  Yes.

5          MS. KIM:  Moving into the record, Your Honor,

6    Government's Exhibit 1A.

7          THE COURT:  Any objection?

8          MR. LAWLOR:  No, Your Honor.

9          THE COURT:  Okay.  I've seen this.  This was provided

10   to me, so I've watched it before.

11   BY MS. KIM:

12   Q.  So for the first two --

13         THE COURT:  This is at 11 o'clock?

14         MS. KIM:  It's at 11:30, Your Honor.  The numbering

15   type --

16         THE WITNESS:  It's Zulu time, so it's not accurate to

17   our actual time.

18         THE COURT:  So 23 I know is 11, but how do I know

19   it's 11:30?

20         THE WITNESS:  I believe the time stamp up there is

21   actually --

22         THE COURT:  23.  So it's 11:23.

23         THE WITNESS:  The Z after it, I believe, stands for

24   Zulu time, which is a different timestamp than we typically

25   have.

1      THE COURT:  Right.  But doesn't it mean 11:30, 11:23?

2      MS. KIM:  I believe, Your Honor, it's 3:23, and so

3  it's just an inaccurate timestamp generally, Your Honor.  It's

4  at Zulu time.

5      THE COURT:  So what time is this?

6      MR. WASSERMAN:  Eastern standard time, Zulu time is

7  four hours ahead.

8      MS. KIM:  Okay.  So it would be around 11:23, that's

9  correct, Your Honor.

10     THE COURT:  Okay.

11 BY MS. KIM:

12 Q.  So approximately -- if we could keep playing the clip.

13     (Video playing.)

14     Sir, playing around 5 seconds to 10 seconds, there

15 appears to be no audio to that video, is that correct?

16 A.  Correct.

17 Q.  Do you know how long there's no audio for?

18 A.  I believe we have a two-minute buffer without audio.

19 Q.  Can you explain why there's a two-minute buffer with no

20 audio?

21 A.  At the two-minute mark here is actually when I activate my

22 camera, which there's audio immediately at that point.  But our

23 cameras have a built-in two-minute buffer period.  So from the

24 moment that I activate, it goes back two minutes and provides

25 video for the previous two minutes before I activate, which is

1    what this is.

2    Q.  But does not provide audio, is that correct?

3    A.  Correct.

4            THE COURT:  Had you had any contact with the

5    defendant in that two minutes?

6            THE WITNESS:  I don't believe so.  I think I

7    activated right as I'm stepping out of the vehicle, before I

8    say anything to Mr. Hood.

9            THE COURT:  Had anybody called headquarters or 911?

10   Had there been a radio run of any sort by this time?

11           THE WITNESS:  Before the two-minute mark?

12           THE COURT:  Yeah.

13           THE WITNESS:  I believe Officer Joseph or Officer

14   Murrell tells us to make contact with Mr. Hood just before we

15   pull up and I activate my camera and step out of the vehicle.

16           THE COURT:  The question was:  Had anybody made a

17   radio run before you got out of the car?

18           THE WITNESS:  So there was no MPD radio run

19   dispatched to us.  This was just us on routine patrol.  But

20   Officer Joseph or Murrell had said to contact the individual

21   before I activated my camera.

22           THE COURT:  Right.  As far as you know, nobody

23   called, made a radio run before you activated the camera?

24           THE WITNESS:  I'm just confused what you're referring

25   to as a radio run.  We were not dispatched to that area before

1    I activated my camera.

2              THE COURT:  What do you call it, if it's not a radio

3    run?

4              THE WITNESS:  A transmission, maybe.

5              THE COURT:  You hadn't called for backup or anything

6    like that?

7              THE WITNESS:  No, no.

8              THE COURT:  Nobody, as far as you know, from

9    Murrell's car or yours, had made any contact asking for backup?

10             THE WITNESS:  No one asked for backup, but I

11   activated my camera as I was about to make contact with

12   Mr. Hood, getting out on 4200 Foote Street.  Prior to that,

13   which had us turn down that street, was Officer Murrell or

14   Joseph, whichever one, radioed from the vehicle saying make

15   contact with that individual.

16             THE COURT:  Right.  They radioed you.

17             THE WITNESS:  Myself and Officer Torres, yes.

18             THE COURT:  And that, presumably, is recorded

19   somewhere?

20             THE WITNESS:  On the radio channel that I believe

21   everyone is asking for.

22             THE COURT:  Right.  Okay.  That's what -- I don't

23   know what -- I always call it a radio run --

24             THE WITNESS:  Right.

25             THE COURT:  -- but it's not, you're calling it --

1   Okay.  So we're looking for that comment by Murrell to you

2   about -- as far as you remember, what was the -- what did he

3   say?

4           THE WITNESS:  Something to the effect of make

5   contact, or stop that individual.  I can't remember the exact

6   terminology.

7           THE COURT:  You don't know why?  He didn't explain

8   anything further?  He just said stop him or make contact with

9   him?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12  BY MS. KIM:

13  Q.  So we're now at the two-minute mark of your body-worn

14  camera footage, if we can start playing that.

15          (Playing video.)

16          Pause.  So from 2 minutes to 2:04, it appears you're

17  exiting the vehicle, is that correct?

18  A.  Yes.

19  Q.  And what is it that you say as you're exiting the vehicle?

20  A.  "Hold on a sec."

21  Q.  Were you shouting at that time?

22  A.  No.

23  Q.  Did you have any kind of firearm out at that time?

24  A.  No.

25  Q.  When you were saying, "Hold on a sec," what was your tone?

1   A.  Just like it is right now, just regular.

2   Q.  And did he stop walking when you said, Hold on a second?

3   A.  No.

4   Q.  We can keep playing.

5           (Video playing.)

6           Pause.  So at 2 minutes and 14 seconds -- we paused

7   at 2 minutes and 15 seconds, approximately -- you asked him

8   about the bulge in his pants, is that correct?

9   A.  Yes.

10  Q.  So, is it fair to say that sometime between when you said

11  "Hold on a sec" and when you said, Let me ask you about that

12  bulge, that you saw a bulge in his pants?

13  A.  Yes.

14  Q.  Can you describe to us exactly what it is that you saw?

15  A.  As Mr. Hood turned his body towards me, I could see a

16  abnormally large bulge, which was not consistent with the human

17  anatomy, I believe, to the left of his groin area in his pants.

18  It was very noticeable.

19  Q.  And based on your training and experience, what did you

20  believe that bulge to be?

21  A.  I believed it could be a firearm.  And I believe Officer

22  Torres also noticed it as we approached as well.

23          MR. LAWLOR:  Objection, Your Honor.

24          THE COURT:  You can tell us what Officer Torres

25  saw -- what he said to you?

 1          THE WITNESS:  He shined his flashlight on the same

 2     area as he's approaching as well, so at that point I knew that

 3     we were both on the same page and believed that it was a

 4     firearm in Mr. Hood's pants.

 5     BY MS. KIM:

 6     Q.  And what did the defendant say as this is all happening?

 7     A.  He said, You do not have my consent to search me, when I

 8     asked him what the bulge was in his pants.  At one point he

 9     reached towards the area and he said it's his dick.

10     Q.  And what did you do in response?

11     A.  I said, "That is not your penis.  Don't reach towards that

12     area."  And I -- I believe I touched his hand and moved it away

13     from that area, since I believed it was a firearm at that time.

14          (Playing video.)

15          THE COURT:  Can you just hold it one minute?

16          (Pause.)

17          THE COURT:  Okay.  Let me ask, when you claim to have

18     seen the large bulge in the left side of his groin, had you --

19     what had you said to him by this point in time?  "Hold on a

20     sec"?

21          THE WITNESS:  I said --

22          THE COURT:  Before you saw the bulge.  In other

23     words, what had you actually communicated to the defendant?

24          THE WITNESS:  I believe, "Hold on a sec."

25          THE COURT:  Okay.  And what was the next thing you

1    said to him?

2              THE WITNESS:  I'll have to re-watch that part of the

3    body camera, but I believe when he said, You don't have my

4    consent to search, and backed up with his hands up, I think I

5    told him, Relax, in regards to the hands being up and things

6    being a little tense.  And I advised him not to keep backing up

7    towards the car.  At this point I could see the bulge, when I

8    advised him to stop backing away.

9              THE COURT:  You said stop what?

10             THE WITNESS:  I said, Relax, in regards to his hands

11   being up and he was backing away, and I advised him to stop

12   backing towards the car because I could see the bulge at that

13   point.

14             THE COURT:  Before you -- had you seen the bulge?

15             THE WITNESS:  Yes, when I told him to stop backing

16   away.

17             THE COURT:  You had already seen the bulge?

18             THE WITNESS:  Yes.

19             THE COURT:  And had Murrell shone the flashlight on

20   him as well?

21             THE WITNESS:  It was Torres, and I don't -- I'm not

22   sure whether he had shined the light at that point.  I will

23   have to watch the video.  You can see pretty clearly when the

24   flashlight goes on that area.

25             THE COURT:  Okay.  Who had the flashlight?  Maybe I

1     thought it was Murrell.

2                THE WITNESS:  Officer Torres, I believe.

3                THE COURT:  So he had gotten out of the car that he

4     was driving?

5                THE WITNESS:  Yes.

6                THE COURT:  Okay.

7                MS. KIM:  Please back it up to around a minute 59,

8     and we could replay what Your Honor just questioned the witness

9     about.

10               THE COURT:  Where are we?

11               MS. KIM:  One minute 59.  This will be prior to when

12    he exited the car.

13               If we could play the clip?

14               THE COURT:  Okay.  Go ahead.

15               (Playing video.)

16               THE COURT:  Okay.  Do you want to stop it a minute?

17               Who's the one with the flashlight on the left side?

18               THE WITNESS:  On the left side, that's Officer

19    Torres, but he -- he was out with his flashlight activated

20    towards the defendant before this encounter.

21               THE COURT:  Okay.  Can you go back to 2:02 on the

22    video?  Okay.  So this is the video at --

23               MR. WASSERMAN:  Do you want me to run it, Your Honor,

24    from here, two minutes?

25               THE COURT:  Yes.

```
 1                    MR. WASSERMAN:  Yes?

 2                    THE COURT:  It's not two minutes.

 3                    MR. WASSERMAN:  The two-minute mark.  I'm sorry.

 4                    THE COURT:  Two-minute mark.  Okay.  Time is 11:26.

 5                    MR. WASSERMAN:  Go ahead and run it, Your Honor?

 6                    THE COURT:  Please.

 7                    (Playing video.)

 8                    THE COURT:  Is he in handcuffs by this point?

 9                    THE WITNESS:  I just placed him in handcuffs with the

10        assistance of another officer.

11                    THE COURT:  Can you go back, Mr. Wasserman?

12                    THE WITNESS:  And then the moment I was referring to

13        with Officer Torres shining his light on the defendant's groin

14        area where the weapon was, I believe that was around 2:08.

15                    THE COURT:  Let's go back to 2:08.

16                    MS. KIM:  Your Honor, we actually have a screen shot

17        of that as Government's Exhibit 2.

18                    THE COURT:  Well, okay.  Let's go back to 2:08.

19                    THE WITNESS:  So, you can see the light being shined

20        on that area as I approached.

21                    THE COURT:  Go back just a little bit, please.

22                    MR. WASSERMAN:  Play it forward, Your Honor?

23                    THE COURT:  2:05.  Yep.

24                    (Playing video.)

25                    THE COURT:  Okay.  This is 2:06.  But, 2:05 he has
```

```
1    his shirt up and he's facing you --

2              THE WITNESS:  Yes.

3              THE COURT:  -- is that accurate?  Okay.

4    BY MS. KIM:

5    Q.  And to make sure, prior to this two-minute and seven-second

6    mark, did you say anything to the defendant other than, "Hold

7    on a sec"?

8    A.  I don't believe so.

9    Q.  And just for clarity's sake, if we can pull up Government's

10   Exhibit 2.

11             THE COURT:  Don't put it on the screen.

12             MR. WASSERMAN:  I'm sorry?

13             THE COURT:  Well, go ahead.  I don't want to lose the

14   tape.

15             MR. WASSERMAN:  No, I've got it stopped at that spot,

16   Your Honor.

17             THE COURT:  So this is -- what's your time on this?

18             MS. KIM:  Three minutes and 25 -- I'm sorry, Your

19   Honor, 11:25.

20             THE COURT:  No, but do you have a video time?

21             MS. KIM:  Unfortunately, no.

22             THE COURT:  Exhibit 2 is admitted.  But I don't think

23   I can -- sometime around 2:06 or 2:07.

24             MS. KIM:  That's correct, it is around 2:07, 2:08

25   that we did a screen shot.  And this was in the presence of the
```

```
1    officer.

2              THE COURT:  Okay.

3              MS. KIM:  When we see it in full view, actually you

4    do see the 2:07 marker, I believe.

5              MR. WASSERMAN:  Well, I switched back to 1A, which --

6    so -- I'm sorry.  This is Government's Exhibit 1A.

7              THE COURT:  1A is admitted and 2 is admitted.

8              MR. WASSERMAN:  Yeah.  So 1A at this point is at 2:07

9    and at 3:25:07 in the upper right corner.  Exhibit 2 in the

10   upper right corner is 3:25:08; in the upper right corner.

11             THE COURT:  What -- this is Exhibit 2.  And what time

12   is it?

13             MR. WASSERMAN:  This is right about 2:07 or 2:08 of

14   the still video.

15             MS. KIM:  And actually, it hasn't been admitted yet,

16   Your Honor.

17             THE COURT:  What?

18             MS. KIM:  Exhibit 2.

19             THE COURT:  I've admitted it.  I'm looking at it.  So

20   it's in, Exhibit 2 and 1A are in; 2 is nothing more than the

21   still of the video.  What number is the video again?

22             MS. KIM:  1A, Your Honor.

23             THE COURT:  So we're looking at the defendant now and

24   it's about 2:07.  Are you able to see him straight on?  In

25   other words --
```

```
 1                    THE WITNESS:  Yes.

 2                    THE COURT:  -- are you standing in a way that you can

 3       see him?

 4                    THE WITNESS:  Yes.  This view is of the body camera

 5       attached to my chest, facing him.

 6                    THE COURT:  And about how far away would you be at

 7       this point?

 8                    THE WITNESS:  Maybe between 3 and 5 feet, I would

 9       guess.

10                    THE COURT:  And the flashlight is what we see in the

11       left corner, focused on his pants?

12                    THE WITNESS:  Yes, that should be Officer Torres'

13       flashlight.

14       BY MS. KIM:

15       Q.  Officer Jacobs, if you can, can you mark on Government's

16       Exhibit 2 where you believe this bulge to be?

17       A.  (Indicating.)

18       Q.  Indicating, for the record --

19                    THE COURT:  Okay, there is a -- I don't know what you

20       call it, looks like a backwards J, what you perceived as a

21       bulge in his pants at the left side, a little below the hip, is

22       that fair?

23                    THE WITNESS:  Yes.

24       BY MS. KIM:

25       Q.  And from your training and experiences, have you seen
```

1     similar type bulges in your training and experience?

2               MR. LAWLOR:  Objection, Your Honor.

3               THE COURT:  Overruled.

4     A.  Yes.

5     BY MS. KIM:

6     Q.  And what, if anything, has that turned out to be?

7               MR. LAWLOR:  Objection, Your Honor.

8               THE COURT:  Overruled.

9     A.  Firearms and other contraband.

10    BY MS. KIM:

11    Q.  When did you initially touch the defendant?

12    A.  After he reaches his hand down towards his pants area where

13    I observed the bulge, I believe I touched his hand and told him

14    something to the effect of:  Don't, don't reach down there, or

15    something.

16    Q.  Why did you do that?

17    A.  Because I believed that there was a firearm in his pants at

18    that point and I did not want his hands around that area or him

19    able to gain access to it.

20    Q.  Who eventually arrested the defendant and put the handcuffs

21    on the defendant?

22    A.  I'm not sure who exactly placed the handcuffs on him, but I

23    know that I grabbed the defendant's left arm and assisted in

24    taking them behind his back and handcuffing him.

25              THE COURT:  Okay.  Before you put the cuffs on him,

```
 1    what had -- what had been said by you and by the defendant,

 2    other than you said, "Hold on a sec," and then you say, Don't

 3    touch that area.

 4              THE WITNESS:  Right.  And I think it would be more

 5    helpful if we can just play the body camera one more time

 6    because I don't remember the exact word-for-word.  But, at the

 7    point in the video where I believe it's Officer Murrell or

 8    Officer Joseph that says 1-800, that is our code word for the

 9    presence of a firearm.  So that -- that is when the handcuffs

10    are being placed on the defendant.

11              THE COURT:  Okay.  We'll go forward on 1A.  You're

12    starting at 2:07.

13              (Playing video.)

14              THE COURT:  "Stop" what?

15              THE WITNESS:  Backing away.

16              (Playing video.)

17              THE WITNESS:  If you can just pause it right here?

18    So, at this point --

19              THE COURT:  That's 2:33 we're pausing.

20              THE WITNESS:  At this point I've observed the bulge I

21    believe to be a firearm.  I'm trying to keep things from

22    escalating and waiting.  You'll be able to see in a minute

23    Officers Joseph and Murrell approaching.  So rather than have a

24    struggle over a firearm with only myself and Officer Torres

25    there, we're trying to wait for the other officers there before
```

```
 1    anyone touches that area or things escalate any further.

 2    That's why I tell the defendant to relax.  I asked him not to

 3    reach towards that area.  And at this time I'm just basically

 4    trying to keep the tension down and keep his hands away from

 5    that area.

 6              THE COURT:  Okay.  Can you just go back a couple --

 7    we're at 2:33, just back up a little bit.

 8              (Playing video.)

 9              THE COURT:  That's the handcuffs.

10              THE WITNESS:  Yes.

11              THE COURT:  3:03.  Okay.

12              MR. WASSERMAN:  Proceed, Your Honor?

13              THE COURT:  (Nods head.)

14              (Video playing.)

15              MS. KIM:  Pause that.

16              THE COURT:  Who's that?

17              THE WITNESS:  That's Officer Minzak.

18              THE COURT:  Who?

19              THE WITNESS:  You're referring to the officer that

20    was just speaking or the one that's on the camera?

21              THE COURT:  The one that said, "Metal hitting metal."

22              THE WITNESS:  That's Officer Minzak.

23              THE COURT:  Give me the last name again.

24              THE WITNESS:  Minzak, M-I-N-Z-A-K.

25              THE COURT:  Okay.  Can you go back to 2:33?
```

1    Mr. Wasserman, just take it back to 2:33.  Or take it to 2:26.

2              (Playing video.)

3              THE COURT:  At what time did he say, Stop backing

4    away to the defendant?

5              THE WITNESS:  It's going to be before this.  I'm not

6    sure exactly.

7              THE COURT:  I'm trying to get the video time.

8              MS. KIM:  I can go back to 2:10.

9              MR. WASSERMAN:  I'm sorry, what was that?

10             MS. KIM:  2:10.

11             MR. WASSERMAN:  Ten seconds.

12             (Playing video.)

13             THE COURT:  2:12.  Okay.  Go ahead.

14             (Playing video.)

15             THE WITNESS:  So, you heard Officer Joseph say, Yep,

16   and you hear 1-800 voice during that interaction.

17             THE COURT:  You put the cuffs on about 3:03.

18             THE WITNESS:  So if you just listen for the "yep" and

19   the "1-800," that's our code for --

20             THE COURT:  Who's speaking at that point?

21             THE WITNESS:  I believe that's Officer Joseph.

22             MS. KIM:  If we could back up about ten seconds.

23             THE WITNESS:  But when the officer reaches to touch

24   the area where we all believe the firearm is, that's when

25   Mr. Hood begins to resist a little and that's when myself and

 1    Officer Murrell hold his arms so the officer can conduct the

 2    pat-down.

 3              THE COURT:  When is that in relation to the

 4    handcuffs?  Was the pat-down before the handcuffs or after?

 5              THE WITNESS:  It's pretty much simultaneous right

 6    here.  If you watch, you'll be able to see it better than I can

 7    explain it.

 8              THE COURT:  Okay.  Can we go back so I can hear the

 9    1-800?

10              THE WITNESS:  And you'll hear the "yep" right prior

11    to that.

12              THE COURT:  Yet?

13              THE WITNESS:  "Yep," like that is a firearm.

14              (Playing video.)

15              THE COURT:  3:04.

16              THE WITNESS:  So the "yep" was just before that, at

17    the very beginning of the video when it was played, and then

18    the handcuffs are put on at 1-800, his voice.

19    BY MS. KIM:

20    Q.  Throughout this entire interaction did you ever raise your

21    voice?

22    A.  I don't believe so.

23    Q.  And just to make sure we have the record clear, who was the

24    one who actually patted him down?

25    A.  I believe it was Officer Murrell or Officer Joseph.

1    Q.  And what was recovered?

2    A.  A Glock 27, .40 caliber pistol with an extended magazine.

3    Q.  Where was it recovered from?

4    A.  From the area where we observed the bulge in Mr. Hood's

5    pants.

6    Q.  Was it loaded?

7    A.  Yes.

8    Q.  Do you know how many rounds were in the magazine, the

9    extended magazine?

10            MR. LAWLOR:  Objection, Your Honor.

11            THE COURT:  Why?

12            MR. LAWLOR:  This isn't relevant as to whether the

13   officer had suspicion to stop the defendant.

14            THE COURT:  I agree.

15   BY MS. KIM:

16   Q.  If we can show Government's Exhibit 3.  What is

17   Government's Exhibit 3?

18   A.  That's the firearm.

19   Q.  And what else does it capture of the firearm?

20   A.  That's the firearm located in Mr. Hood's pants.

21   Q.  Is that where it was located when it was recovered from

22   him?

23   A.  Yes.

24   Q.  Is it a fair and accurate representation of where the

25   firearm was recovered on September 16th, 2019?

```
 1    A.  Yes.

 2               MS. KIM:  Admitting into the record, Your Honor,

 3    Government's Exhibit 3.

 4               THE COURT:  That's 3?

 5               MS. KIM:  Yes.

 6               THE COURT:  Okay.  Admitted.  Three is admitted.

 7    BY MS. KIM:

 8    Q.  And to clarify for the record, what part of the firearm is

 9    at the top of the waistband?

10    A.  That looks to be the magazine at the top area there.  Yes.

11               THE COURT:  Okay.  I just want to go back and

12    pinpoint the time when you first saw the bulge.  Had you seen

13    the bulge before you said, "Stop backing away"?

14               THE WITNESS:  Yes.

15               THE COURT:  That's at about 2:12.  So let's just go

16    back a little bit.  And you tell me when you first were able to

17    identify a bulge.

18               MS. KIM:  Keep going to --

19               THE WITNESS:  You might want to start it at two

20    minutes.

21               MS. KIM:  Start it at two minutes.

22               MR. WASSERMAN:  Sure.

23               (Playing video.)

24               THE WITNESS:  Here.

25               THE COURT:  2:07.  Is that fair, 2:07?
```

1          THE WITNESS:  It was hard to tell right there on the

2     video, but as he turns his body towards me is when I notice it,

3     and then just after that Officer Torres shines his light on the

4     area.  So it may be a couple seconds before 2:07.

5          THE COURT:  He's using a flashlight?

6          THE WITNESS:  That's what I'm saying, is I noticed it

7     just before that, so --

8          THE COURT:  We keep talking about radio runs, but I

9     don't know whether they're radio runs or just communications

10    between the two cars or more than the two cars.  What else,

11    besides the conversation when Murrell says whatever he says,

12    contact him or stop him?  Are there other communications that

13    you've heard on that tape?

14         THE WITNESS:  When you hear the 1-800 on the video, I

15    believe that's voiced over the radio.  That lets our

16    supervisors and coworkers know we're dealing with a firearm, so

17    typically more officers will come.  And then I'm sure that we

18    requested a transport or something on there.

19         But, the radio runs that I was concerned with, as far

20    as the stop, was just --

21         THE COURT:  Between the two cars?

22         THE WITNESS:  Right.

23         THE COURT:  But what you have heard starts when in

24    the whole -- what do you -- what radio run has been made

25    available so far?

```
 1                    THE WITNESS:  Well --

 2                    THE COURT:  After you call for transport or before?

 3                    THE WITNESS:  You can hear us say 1-800 on the radio

 4       run.  The other only thing missing is the other vehicle telling

 5       us to make contact with the vehicle.

 6                    THE COURT:  Mr. Wasserman, where are we on that?

 7                    MR. WASSERMAN:  I've been looking at my emails and I

 8       think they've downloaded it and somebody is going to be

 9       bringing it over.  It's apparently a fairly large file because

10       they have to essentially download a lot more than what is

11       pertinent.  So, they're working on it and I think it's

12       downloaded now.  I will step out after we finish direct and

13       make a phone call.

14                    THE COURT:  Go ahead.  I think we're pretty close to

15       finishing.

16                    MS. KIM:  That's correct, Your Honor.

17                    THE COURT:  I have a hearing at what time?

18                    THE COURTROOM DEPUTY:  12:30, Your Honor.

19                    THE COURT:  Which won't take long.  Okay.  All right.

20       Finish up.

21       BY MS. KIM:

22       Q.  All right.  I'm going to show the witness what has been

23       marked as Government's Exhibit 4.  Do you recognize that?

24       A.  Yes.

25       Q.  What is it?
```

 1   A.  That's a firearm that was recovered from Mr. Hood's pants.

 2   Q.  Does it also show the extended magazine?

 3   A.  Yes.

 4   Q.  Is it a fair and accurate depiction of the firearm that was

 5   recovered from the defendant on September 16, 2019?

 6   A.  Yes.

 7           MS. KIM:  Moving into the record, Your Honor,

 8   Government's Exhibit 4.

 9           THE COURT:  Any objection?

10           MR. LAWLOR:  No, Your Honor.

11           THE COURT:  All right, 4 is admitted.

12           MS. KIM:  No further questions, Your Honor.

13           THE COURT:  Okay.  Mr. Lawlor -- sorry, we're trying

14   our best to get it here as swiftly as possible.

15           MR. LAWLOR:  Your Honor, I think -- having now heard

16   the testimony, I understand from the officer what the substance

17   of it is, I think I can probably proceed.  I do want to let the

18   Court know that --

19           THE COURT:  I think it's 11:35.

20           MR. LAWLOR:  Yeah, I really need to be out of here no

21   later than one.

22           THE COURT:  We'll do what we can.

23           MR. LAWLOR:  All right.

24           THE COURT:  As I said, you'll get to hear the radio

25   run before you complete your cross.

1         MR. LAWLOR:  Well, I think, with the Court's

2   permission --

3         THE COURT:  We'll just come back on Tuesday?

4         MR. LAWLOR:  I'm sorry?

5         THE COURT:  We'll come back on Tuesday and you'll

6   have heard the radio run.

7         MR. LAWLOR:  Do you want me to reserve my cross until

8   Thursday then?

9         THE COURT:  No, not the whole cross.  Go ahead.

10   Whatever you can accomplish without.

11         MR. LAWLOR:  Let me do that.

12         THE COURT:  You've heard the radio run starting at

13   some point.

14         MR. LAWLOR:  Correct, but not the communication

15   between the two vehicles, which, as Your Honor has indicated,

16   is more of a transmission between the two cars.  But, and

17   just --

18                    CROSS-EXAMINATION

19   BY MR. LAWLOR:

20   Q.  It's Officer Jacobs, is that right?

21   A.  Yes.

22   Q.  Officer Jacobs, just to that end, your best recollection is

23   one of the other officers in the car ahead of you, driving the

24   same direction as you on 42nd Street, number one, has an

25   exchange with Mr. Hood, is that right?

1    A.   Yes.

2    Q.   And this is a residential area, right?

3    A.   Yes.

4    Q.   It's 11:30 at night?

5    A.   Right.

6    Q.   And before you get out of your car, there's nothing unusual

7    about Mr. Hood, is there?

8    A.   The only thing I observed that appeared a little unusual to

9    me was him looking back at the vehicle as he walked away.

10   Q.   Okay.  Why is that unusual -- what's unusual about him

11   looking back at the vehicle?

12   A.   Because typically when we have -- most of our regular

13   contacts, people, if there's nothing going on out of the

14   ordinary will just keep it moving, keep going in the direction

15   they're going, think about what they're doing.  In many

16   instances when people either run from the police or we wind up

17   finding contraband on them later, they'll continue to monitor

18   the police presence to see if we're either going to turn our

19   vehicle around or whether we're still focused on them or not.

20   So the looking back kind of raised a red flag to me in that

21   instance.

22              THE COURT:  What car is he looking at?

23              THE WITNESS:  Officer Murrell and Officer Joseph's.

24              THE COURT:  At this point is that car going -- let's

25   call it north on 42nd?  Or has it turned around to go onto

1    Foote?

2            THE WITNESS:  At that point the vehicle is the

3    opposite direction in which he's walking.  So he's looking back

4    at the vehicle.

5            THE COURT:  Is he on 42nd or --

6            THE WITNESS:  He's still on 42nd.

7    BY MR. LAWLOR:

8    Q.  If it's -- as Her Honor indicated, for the sake of

9    discussion, assume that you were both traveling north on 42nd,

10   Mr. Hood is traveling south on 42nd, makes a left on Foote,

11   right?

12   A.  Right.

13   Q.  And you're in an unmarked car?

14   A.  We both are, yes.

15   Q.  But you are -- you're conspicuous as police officers,

16   right?

17   A.  Yeah.

18   Q.  You have tactical vests that say "Police" in big white

19   letters on the front, right?

20   A.  It has police identifiers and a badge on it, as well as

21   police equipment.

22   Q.  So anybody that -- two solid working guys who make contact

23   with you know that you're the police, right?

24   A.  Right.  As well as the unmarked vehicles are pretty uniform

25   across the city, so many people do realize that they are police

1    vehicles.

2    Q.   Okay.  So how long was this exchange that Mr. Hood had with

3    Officer Murrell?

4    A.   It was a brief exchange.

5    Q.   Had their car come to a complete stop?

6    A.   I believe it was stopped.

7    Q.   Okay.  And you then make a right after receiving this

8    transmission from Officer Murrell?  You make a right onto Foote

9    Street, right?

10   A.   Yes.  And it was either Officer Murrell or Officer Joseph,

11   I'm not sure which one of them made the transmission.

12   Q.   It was a transmission from the car in front of you?

13   A.   Right.

14   Q.   The car with two officers in it, right?

15   A.   Right.

16   Q.   And that had just slowed down and had some brief

17   interaction with Mr. Hood, right?

18   A.   Right.

19   Q.   And at this point, as they indicated, he's walking, right?

20   A.   Right.

21   Q.   He makes a left onto Foote Street, right?

22   A.   Right.

23   Q.   And other than the fact that he's looked back, he's just

24   walking in a residential area, right?

25   A.   Right.

1    Q.   Okay.  So, you get out of your car.  You get out of the car

2    on the passenger's side, right?

3    A.   Correct.

4    Q.   And is -- at this point Mr. Hood is to your left, right?

5    A.   Yes.

6    Q.   Okay.  So now if we assume your car is facing east, for the

7    sake of this discussion, he's on the other side of the car,

8    right?

9    A.   Right.

10   Q.   And Officer Torres gets out of the driver's side of that

11   car at the same time that you get out of the passenger's side,

12   right?

13   A.   To be honest, I was focused on Mr. Hood.  I'm not

14   100 percent sure at which moment Officer Torres gets out of the

15   vehicle.  He's driving and putting the car in park and stuff,

16   so I think I got out just before he did.

17   Q.   But we recall from the video, you turn -- you turn your

18   radio on at two minutes, right -- excuse me, your body-worn

19   camera on at two minutes, right?

20   A.   Right.

21   Q.   And it's at that point we can see that your door is just

22   opening, right?

23   A.   Right.

24   Q.   And by 2:07 you're proximate to Mr. Hood, right?

25   A.   Right.

1    Q.  And at that point we know Officer Torres is already out of

2    the car because he's shining a flashlight in his vicinity?

3    A.  Right.  Right.

4    Q.  And is he shining a flashlight at that time specifically at

5    his groin or is he just sort of sizing up Mr. Hood from, kind

6    of, head to toe, if you will?

7    A.  At that point the flashlight -- I believe at 2:07 it's

8    directly on the groin area.

9    Q.  The groin area or his midsection?

10   A.  The groin area.

11   Q.  The shirt he's wearing, he hasn't pulled his shirt up,

12   right?  He's made a very unfortunate fashion choice and he's

13   wearing some sort of a crop top, right?

14   A.  From my encounter from start to finish with Mr. Hood, I

15   observed him with a crop top on.

16   Q.  He hasn't pulled his shirt up?

17   A.  Not to me.

18   Q.  That shirt sort of just -- it stops right below his chest,

19   right?

20   A.  Right.  I think I refer to it as a Ezekiel Elliott cut

21   shirt, like a crop.

22        MR. LAWLOR:  I got $5, Your Honor, that says you

23   don't know who Ezekiel Elliott is.  He's a pro football player

24   who also makes unfortunate fashion choices.

25        THE COURT:  Okay, but you're not getting $5 from me.

1          MR. LAWLOR:  My bet was with the officer.

2    BY MR. LAWLOR:

3    Q.  So, you're out of the car and you have already said, "Hold

4    on a sec," right?

5    A.  I think I said, "Hold up a sec."

6    Q.  "Hold up a sec" or "Hold on a sec."  And you're stopping

7    him, right?  I mean, there's no question -- let me ask you

8    this:  If he told you to go you-know-what and kept walking,

9    would you have gone hands-on?

10          MS. KIM:  Objection.

11          THE COURT:  It's hypothetical.

12   BY MR. LAWLOR:

13   Q.  Your intent was to stop him?

14   A.  My intent was to contact him and investigate further.

15   Q.  Which means that if -- at the point he's walking, he's in

16   front of your vehicle, right?

17   A.  He's actually walking, like, towards were the parked cars

18   are along the side of the street.  So he's to the left of our

19   vehicle.  He's not, like, directly in front of our vehicle.

20   Q.  But he's still walking?

21   A.  He's still walking at this point, yes.

22   Q.  All right.  So when you get out of the car, you say, "Hold

23   on a sec," you want him to stop walking, right?

24   A.  I asked him to "Hold up a sec" so that I could address him

25   further.

1    Q.  "Hold up a sec" means stop walking, right?

2                MS. KIM:  Objection.  Asked and answered.

3                THE COURT:  Go slower.  Ask the question again.

4                MR. LAWLOR:  Sure.

5    BY MR. LAWLOR:

6    Q.  When you say, "Hold up a sec," number one, your meaning is

7    to stop walking?

8    A.  If my meaning was to stop, I would -- and I do this on many

9    times where I conduct stops -- I would say, "Stop," in a loud,

10   authoritative voice.  At this point I was trying to make

11   contact with Mr. Hood and I said, "Hold up a sec" in a regular

12   tone.

13               THE COURT:  When you say you were trying to make

14   contact, what do you mean?

15               THE WITNESS:  I was trying to speak with Mr. Hood and

16   investigate further the circumstances of what was going on.

17   BY MR. LAWLOR:

18   Q.  But the only way you're going to be able to make contact

19   with him and investigate the circumstances further is if he

20   ceases moving away from you, right?

21   A.  I was at this point out of my vehicle and walking towards

22   him as he was still walking.  I was asking him to hold up a

23   second, in addressing, like, May I speak with you for a moment?

24   Before I could ask, May I speak with you, which I typically do

25   on all my contacts, he's saying, You do not have my consent to

1    search me.

2    Q.  Right.  But you didn't say, May I?

3    A.  I didn't even get a chance.

4    Q.  Or, Would you please consider stop walking?  You said,

5    "Hold up a sec."  It's a statement, not a question, right?

6    A.  I said, "Hold up a sec."  I was not telling him to stop,

7    but -- I was not saying it in a manner -- when I'm conducting a

8    stop specifically, I will speak loud and in an authoritative

9    tone, so that the person that I'm contacting knows stop right

10   there, like --

11   Q.  You've never had an exchange with Mr. Hood before?

12   A.  No.

13   Q.  It's 11:30 at night, right?

14   A.  Right.

15   Q.  He's just had one carful of two officer stop and engage

16   him, right?

17   A.  I believe he engaged the officers.

18   Q.  Regardless, he's had an exchange with two police officers,

19   right?

20   A.  Right.

21   Q.  Like you said, also dressed conspicuously to alert

22   everybody and anybody that you are the police, right?

23   A.  Right.

24   Q.  And now your car pulls up adjacent to him, right?

25   A.  Um-hum.

1    Q.  You and Officer Torres get out of your car?

2    A.  Right.

3    Q.  Conspicuously identified as the police, right?

4    A.  We are wearing police identifiers.

5    Q.  And he's walking down the street of a residential area,

6    correct?

7    A.  With his hands up, yes.

8    Q.  All right.  Nonetheless, he's walking down the street of a

9    residential area, right?

10   A.  Right.

11   Q.  And you get out of the car and you don't say, May I speak

12   to you?  Or, Would you stop?  You say, "Hold up a sec," right?

13   A.  I say, "Hold up a sec," yes.

14   Q.  As you and Officer Torres are getting out of the vehicle

15   and walking towards him, right?

16   A.  Right.

17   Q.  And now, what he's wearing, in addition to the shirt, is

18   he's wearing sweatpants, right?

19   A.  Right, some sort of athletic pant.

20   Q.  And the sweatpants, they're not form-fitting, right?

21   A.  Do you mean are they tight?

22   Q.  Do you know what yoga pants are?

23   A.  Yes.

24   Q.  They're not yoga pants, right?

25   A.  I don't believe so.

1    Q.  They're sweatpants, right?

2    A.  Right.

3    Q.  And they're -- I don't want to say baggy, but they're not

4    tight, right?

5    A.  I definitely wouldn't refer to them as baggy.

6    Q.  All right.  But my question isn't whether or not they were

7    baggy, my question is whether or not they were tight?

8    A.  I mean, they were regular athletic pants.  They're not like

9    baggy jeans or anything, but they're definitely tighter than,

10   like, a typical pair of kakis or jeans that you would wear.

11   They're regular as far as athletic pants.

12   Q.  Regular as far as athletic pants.  And regular as far as --

13          THE COURT:  They're not like the Spandex?

14          THE WITNESS:  No, no.

15   BY MR. LAWLOR:

16   Q.  And they have pockets, right?  Or your assumption is that

17   they have pockets, right?

18   A.  I think they did have pockets.

19   Q.  Okay.  So he's wearing a pair of sweatpants that have

20   pockets.  And when you get out of the car, like you said,

21   you've seen him look back.  By the time you say, "Hold on a

22   sec," you've seen a guy walking down a residential street who

23   has looked back at the car and that's kind of it, right?

24   A.  I've seen that.  I've heard my coworkers ask me to make

25   contact with him, so I know that they, at that point, have

1    something, a strong suspicion.  And I've also seen Mr. Hood

2    blading his left side of the body away from myself and Officer

3    Torres as we're driving towards him.

4    Q.  What has been communicated to you by the time you make

5    contact with Mr. Hood that is suspicious to the officers in the

6    other car?

7    A.  They just told me to make contact with Mr. Hood.  And I

8    have enough trust built up with the officers that I work with,

9    when they tell me to make contact or to stop or to interact

10   with someone, we don't need to address every single thing on

11   the radio.  I know that they've seen enough to warrant me

12   investigating things further, and I have trust.

13   Q.  Had they communicated a suspicious fact about Mr. Hood to

14   you?

15   A.  No.

16   Q.  So they've told you -- hold up, in your mind, means he's

17   suspicious.  That means, in your mind, even though there's been

18   no articulable fact relayed to you, right?

19           MS. KIM:  Objection.

20           THE COURT:  What's the basis?

21           MS. KIM:  Calls for a legal conclusion.

22           THE COURT:  Calls for --

23           MS. KIM:  For a legal conclusion.

24           THE COURT:  I don't know about articulable fact.

25           When they called you, as far as you could observe,

1    had he put his arms in the air yet?

2             THE WITNESS:  I believe his arms were up.  I'm not

3    sure at what exact moment they said to contact him.  But I know

4    just as they were saying to contact him, I had already observed

5    him walk off and looking back at their vehicle, and I was

6    debating in my mind whether I should go contact him before they

7    even say go contact him.  So, my suspicions were already risen,

8    as well.

9    BY MR. LAWLOR:

10   Q.  Based on what?

11   A.  I think I explained before about -- I mean, typically in

12   this fashion, when we -- we had two vehicles in this instance.

13   Sometimes we'll have two, three vehicles riding around every

14   day.  There are many times where a first vehicle will make

15   contact or drive by an individual.  Part of being in the

16   second, third, or fourth vehicle, depending on how many you

17   have, is to observe how people react to the police officer's

18   presence, specifically, as you're saying, our unmarked vehicles

19   and our conspicuous uniforms.  We're the only plain clothes

20   units in the city that wears plain clothes with a tactical vest

21   over it.

22            So most people in the neighborhoods we patrol know

23   and basically identify as, okay, that's the guns squad.  So

24   when I see someone observe the presence of the gun squad and

25   either turn their body, blade their body, walk in the opposite

1    direction, look back at the vehicle to see if the vehicle is

2    still focused on them, these are all things that draw a red

3    flag in my mind to investigate or monitor further the -- in

4    many cases before I've had the same reactions and these

5    individuals have had, in fact, a gun on their person and fled

6    from the police.

7    Q.  So let's break that down a little bit.  Number one, he

8    didn't flee, right?

9    A.  Right.

10   Q.  Number two, he engaged -- from your vantage point you

11   couldn't hear what was said?

12   A.  Right, I couldn't.

13   Q.  You just saw him engage with the other officers, right?

14   A.  Right.

15   Q.  And then he continued to walk in the same direction that he

16   had been walking, right?

17   A.  Well, he made that left turn.

18   Q.  Okay.  But, he didn't turn around and go in an opposite

19   direction, did he?

20   A.  I mean, he went in the opposite direction where the police

21   were located.  I didn't know at that time that his home was on

22   that street, but he made a left turn off of that street.

23   Q.  That's not opposite, that's in the same direction, but

24   left?  That's not opposite, right?  He wasn't going north and

25   then went south?

```
 1    A.   In my mind, when I'm observing him, I see him make that
 2    left turn.   I see ourselves, you know, just past Foote Street.
 3    He's going in such a direction that he does not encounter
 4    another police vehicle, is what I observed.   I did not know at
 5    this point that he lives on that street.
 6    Q.   Right.   Without running or doing anything to sort of
 7    conceal his location, right?
 8    A.   He's not running, no.
 9    Q.   Right.   Or doing anything -- he doesn't duck down behind a
10    car?
11    A.   Right, right.
12    Q.   Or roll into some bushes?
13    A.   Right.
14    Q.   This bulge, you say, being candid, right, every bulge in
15    your mind is a gun, right?
16    A.   I don't believe I ever said that.
17              MS. KIM:   Objection.
18              MR. LAWLOR:   Well --
19              THE COURT:   Overruled.
20    BY MR. LAWLOR:
21    Q.   I'm asking, like you say, you see a bulge, dude wearing
22    sweatpants, he's got a bulge, and right away -- I mean, in
23    combination with the other factors, that he put his hands up
24    and he bladed and he looked back, so this combination of
25    factors, in your mind, in addition to a bulge in his groin
```

1   area, is a weapon or contraband, you said, right?

2   A.   That's kind of a long question.  I'm trying to --

3   Q.   Sure, it is.  It is.

4   A.   Basically, to what you're saying about I think every bulge

5   is a weapon, I played on an athletic team through college and

6   have been in many locker rooms, I wore athletic warmups

7   basically every day.  I've seen bulges in sweatpants before

8   that are consistent with the human anatomy.  This was very

9   noticeably inconsistent with the human anatomy and much larger

10  than a typical bulge.

11  Q.   So let's agree -- you know, not to be too cute here, but

12  let's agree that your suspicion was that Mr. Hood was not

13  someone of massive human anatomy.  But the man had pockets,

14  right, in his pants?

15  A.   I mean, if that was Mr. Hood's human anatomy, I would

16  probably call an ambulance for him at that point.  That was far

17  beyond what could be consistent with that.

18  Q.   My point is, aside from the fact that might have been a

19  bulge that wasn't or wasn't his human anatomy, it could have

20  been a cell phone, it could have been a wallet in his pocket, a

21  cell phone and a wallet in his pocket, right?  He's wearing

22  pants that have pockets?

23  A.   He was wearing pants that had pockets.  But as far as my

24  observations on the bulge, I've observed many cell phones in

25  people's pockets, wallets.  At this point when I observed the

1  bulge, I did not believe that it was a cell phone; I believed

2  that it was a weapon.

3  Q.  That's what I'm getting back to here.  In your mind, a

4  bulge equals contraband?  Let's agree -- let's agree that your

5  assessment of his anatomy is a fair one.  My question is:  You

6  said he's got a bulge, you've deduced that it's not his penis

7  and, therefore, your assumption is that it's a weapon?

8  A.  Because of the shape of the bulge, the location of the

9  bulge.  And, like I said, I've observed cell phones, wallets,

10  other items in people's pockets.  I do not think that every

11  bulge I see on a person is a weapon and I investigate further.

12       But at this point I didn't need to investigate

13  further.  I could see from the location that's not directly

14  where the pocket is; the size and the shape, that it is not a

15  wallet in his pocket, and I believed it to be a weapon in this

16  instance particularly.

17  Q.  But when you get out of the car and you told him, Hold on a

18  second, you hadn't seen anything at that point, right?

19  A.  I'd just observed his behavior.  I hadn't observed the

20  actual bulge at this point.

21       MR. LAWLOR:  Okay.  Those are all the questions I

22  have, Your Honor, on that.

23       THE COURT:  Okay.  Have you gotten word back?

24       MR. WASSERMAN:  I'm sorry, Your Honor.  Let me

25  just -- the last I heard they were downloading it.  I can make

1    a phone call.

2                    THE COURT:  All right.  Let's take a quick break.

3    You make the phone call.

4                    We can delay the 12:30.

5                    THE COURTROOM DEPUTY:  All right.

6                    THE COURT:  Okay.  And for purposes of if we need to

7    come back, which I think we will, what time on Tuesday, the

8    14th?  What time is your hearing before Judge Hogan?

9                    MR. LAWLOR:  Judge Hogan at three, Your Honor.

10                   THE COURT:  Is there -- is that a long hearing?

11                   MR. LAWLOR:  It's just a plea -- what I hope and pray

12   will be a plea.

13                   THE COURT:  Well, maybe we can figure out whether we

14   can move it up a little bit and be here at three.

15                   MR. LAWLOR:  Okay.

16                   MS. KIM:  That's fine for the government.

17                   THE COURT:  All right.  Let us take a break at this

18   time.  And as soon as you get word, let Mr. Smith know.

19                   Okay.  Officer, don't discuss your testimony with

20   anyone.

21                   THE WITNESS:  Yes.

22                   THE COURT:  You're excused.

23                   THE WITNESS:  Thank you.

24                   THE COURT:  You'll be in communication, find out

25   whether they can get it to us before one.

 1          MR. WASSERMAN:  Yes, Your Honor.

 2          (Recess.)

 3          THE COURTROOM DEPUTY:  Recalling the matter of United

 4   States of America versus DeShawn Hood, criminal record 19-315.

 5          THE COURT:  Okay.  What did you learn, Mr. Wasserman?

 6          MR. LAWLOR:  Your Honor, my client --

 7          THE COURTROOM DEPUTY:  He'll be right out.

 8          THE COURT:  One second.

 9          (Pause.)

10          THE COURT:  Okay.

11          MR. WASSERMAN:  Your Honor, it's my understanding

12   from MPD communications that it takes 24 hours for them to

13   essentially download the recording.  And we can't actually go

14   to MPD to get the DVD from them directly, it has to be imported

15   into our server, which takes 24 hours.  So we should have that

16   by Monday.  Obviously, we'll review it, make it available to

17   Mr. Lawlor and --

18          THE COURT:  I would like to have it available to

19   chambers, as well.

20          MR. WASSERMAN:  I can certainly make arrangements to

21   get chambers.  Given that I think it's going to be a long

22   window of dead time because they're actually going to just get,

23   I think, about 12 hours of time, I don't want to hand the

24   chambers, you know, 12 hours of dead time.  So, we'll listen to

25   it, and anything of pertinence -- we'll give Mr. Lawlor the

1    whole thing, but to the extent that we find anything pertinent

2    on it to this case, we'll transmit that to chambers on Monday.

3    Either way, I'll let -- there may not be anything, but either

4    way, I'll let chambers know.

5                THE COURT:  Is the officer still here?

6                MS. KIM:  Yes, he is.

7                THE COURT:  Let's bring him back in for one minute.

8    I just want to ask a follow-up question or two.

9                So, Mr. Lawlor, I'm looking at the, sort of,

10   schedule.  I can tell already what I need before I can rule,

11   and I may have to take it under advisement.  I would like from

12   counsel -- but I think you need to listen, if there is a radio

13   run, to what it says.  I want each counsel to give me -- it can

14   be short -- of when the seizure took place here under your --

15   when you believe that the law says there was a seizure.  But

16   he's going to argue, Wait a sec, and you're going to argue when

17   he said, Stop walking away, is my guess.

18               MR. LAWLOR:  That's a fair assumption, I think.

19               MS. KIM:  Yes, Your Honor.

20               THE COURT:  I think it is.  So I want the law that

21   supports both positions.  When can I have that in?  Let's say

22   you're going to get what you're going to get early next week.

23   Can I look to you to give me some law on the 17th?

24               MR. LAWLOR:  Your Honor, I'm going to tell the Court

25   that normally I would ask for a lot of time here, but Mr. Hood

1    is terrifically anxious to get an order from the Court.

2                THE COURT:  I know he is.  And I want to decide it

3    before I leave, for sure.

4                MR. LAWLOR:  I'd be prepared to bring that with me on

5    Tuesday, provide it to the ECF on Tuesday.  The government told

6    me they just hired a new intern, Your Honor, so they have

7    someone to help with the research.

8                THE COURT:  But I think the key factor here is going

9    to be listening to the radio run.  That's why I want us to hear

10   it.

11               You're hopeful you'll be able to get it to both

12   chambers and Mr. Lawlor?

13               MR. WASSERMAN:  I'm sorry --

14               THE COURT:  Are you hopeful you'll get it to chambers

15   and Mr. Lawlor on Monday?

16               MR. WASSERMAN:  Yes.

17               THE COURT:  I still think that I want to have the

18   benefit, after you've heard it, so -- we have a holiday on

19   Monday, the 20th.  I'm here the 21st, I have a full day of

20   hearings.

21               MR. LAWLOR:  Your Honor, forgive me.  I start a

22   murder trial that's going to go two weeks, so I really prefer

23   that on the -- whatever that Tuesday is after the holiday, I

24   would much prefer that everything is at least to Your Honor.

25   Obviously you'll rule when you're ready to rule.

```
 1                THE COURT:  No, I'll rule quickly, believe me.
 2    That's fine.  Let us plan to come back -- why don't you see
 3    what you can do with Judge Hogan.
 4                MR. LAWLOR:  Okay.  And my partner is here in court,
 5    Your Honor.  I discussed with Mr. Smith that if push came to
 6    shove, my partner could handle a plea in front of Judge Hogan.
 7    So I can be here Tuesday afternoon.
 8                THE COURT:  Fine.  If we have to break, we could
 9    break.  Let's see.  The -- it's at 11 o'clock and it's about an
10    hour away.  So, 3 o'clock.
11                MR. WASSERMAN:  3 o'clock Tuesday.
12                THE COURT:  And I would like to see the memoranda.
13    It doesn't have to be more than five pages.  I mean, the law,
14    you're going to both pick different cases.
15                MR. LAWLOR:  Mine will be the right ones.
16                MR. WASSERMAN:  When would you like it filed, Your
17    Honor.
18                THE COURT:  I would like it by 10 o'clock on the
19    14th.
20                MR. LAWLOR:  A.m. or p.m.?
21                THE COURT:  I'm sorry?
22                MR. LAWLOR:  A.m. or p.m.?
23                THE COURT:  A.m.  No, I want it the day that we're
24    coming back, and I can hear argument, if need be.
25                MR. WASSERMAN:  That's fine.  I assume we're going to
```

1    have the officer available, should -- I know Ms. Kim may have

2    some additional -- obviously, Mr. Lawlor may have some

3    additional cross and Miss Kim may have brief redirect, but I

4    don't expect it's going to be very long.

5             THE COURT:  I think we ought to allow that.

6             Mr. Lawlor, you've finished, right, but you might --

7             MR. LAWLOR:  Yes.

8             THE COURT:  -- you might have a question on the radio

9    run?

10            MR. LAWLOR:  Transmission, yeah.

11            THE COURT:  We're going to ask you, let's say by

12   11 o'clock on the 14th, we'll have short memorandum from both

13   sides about when did the seizure occur?  When was there a *Terry*

14   stop?  I'm assuming you're arguing there's a *Terry* stop.

15            MR. WASSERMAN:  Yes, Your Honor.

16            THE COURT:  So, the question is when.  And if you

17   submit that on the morning of the 14th, by 11 o'clock, we'll be

18   back at three.  I can't promise I'll rule from the bench,

19   there's too many moving parts, but Mr. Hood will get an opinion

20   quickly.  I assure him of that.

21            Okay.  You'll let us know if you're not going to find

22   this tape and why not.

23            MR. WASSERMAN:  Correct.

24            THE COURT:  Can we have the Officer Jacobs come back

25   one minute?

```
 1                    MR. WASSERMAN:  Oh, yes.

 2                    THE COURT:  All right.  He's still under oath.  This

 3      won't take long.

 4                    Officer, I have a couple more question for you.

 5                    THE WITNESS:  Yes.

 6                    THE COURT:  You're the person, to your credit, who

 7      has said that what you've listened to on the radio run is not

 8      the whole radio run.  I call it a radio run; but, the

 9      transmission.

10                    THE WITNESS:  Right.

11                    THE COURT:  And because that is that you got

12      communications from Murrell to your car?

13                    THE WITNESS:  Yes.

14                    THE COURT:  And what's your best recollection of what

15      was said?

16                    THE WITNESS:  I know that I was directed to contact

17      Mr. Hood in some form, fashion.  I don't know whether the exact

18      words were:  Talk to him, Contact him, or, Stop him.  That's

19      why I wanted to hear it, to refresh my memory.

20                    THE COURT:  Okay.  And --

21                    THE WITNESS:  But I was directed to Mr. Hood by the

22      other vehicle.

23                    THE COURT:  And you said you had a discussion with

24      Murrell after sometime.  And what did he tell you about his

25      exchange with the defendant that preceded this?
```

1          THE WITNESS:  It was Officer Joseph that I spoke

2     with.  Well, I spoke with both of them.  But, one of them

3     communicated to me that Mr. Hood said something to the effect

4     of hello, or some sort of greeting.  They said they greeted him

5     back, and then he said, I'm just trying to go home, which

6     struck them as odd.

7          THE COURT:  Well, that's what they told you

8     afterwards.

9          THE WITNESS:  But that's the extent of our

10    conversation about that.

11         THE COURT:  Okay.  So the exchange is brief.  And

12    then you believe you got some kind of transmission?

13         THE WITNESS:  Yes.  Shortly after that.

14         THE COURT:  Okay.  Did you have a couple of questions

15    you want to ask now?  I'd just as soon we finish up anything

16    that we can do.

17         MS. KIM:  That makes sense, that we finish it up on

18    Tuesday.

19         THE COURT:  Okay.  But you have questions then.  All

20    right.

21         MR. LAWLOR:  Your Honor, can I have one moment,

22    please?

23         THE COURT:  Absolutely.

24         (Pause.)

25         THE COURT:  And when you said, "Hold on a sec," what

```
1    did the defendant do at that point?  You got out of the car --

2    and I have the time -- but, "Hold on a sec," what did he do

3    after that?

4              THE WITNESS:  I think I said, "Hold up a sec."  And

5    at some point in there he -- his hands were already up and he

6    was still walking away from me, and at some point he said, You

7    don't have consent to search me.  I'm not sure the exact

8    exchange.

9              THE COURT:  But he was still walking away.  And which

10   direction?

11             THE WITNESS:  The same direction that he had been

12   walking when I turned onto that street, down Foote Street.

13             THE COURT:  Okay.  In the direction of what you were

14   told was his home?

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.

17             THE WITNESS:  But at this point he wasn't on -- he

18   wasn't walking on the sidewalk, he was walking in the street,

19   next to the parked vehicles.

20             THE COURT:  And he got on the street before you said

21   anything to him?

22             THE WITNESS:  Right.  Right.

23             THE COURT:  I mean, whether it be, "Hold on," or

24   "Hold up a sec?"

25             THE WITNESS:  Right.
```

```
1              THE COURT:  He was already in the street?

2              THE WITNESS:  Right.

3              THE COURT:  Sorry.  Go ahead, Mr. Lawlor.

4     BY MR. LAWLOR:

5     Q.  The conversation you had with Officer Joseph about the

6     greeting or whatever the exchange was between Mr. Hood and the

7     officers was after the arrest?

8     A.  Yes.

9              MR. LAWLOR:  Okay.  All right.  Thank you.

10             THE COURT:  All right.  The government will have --

11    you've completed your cross?

12             MR. LAWLOR:  Subject to --

13             THE COURT:  Subject, okay.  We'll be back at three.

14    I want everybody to have the opportunity to hear the thing

15    before then.  We'll, obviously, hear it before then.

16             Sorry about this, Mr. Hood, but we're moving it along

17    the best we can.

18             Are you having any witnesses?

19             MR. LAWLOR:  I mean, there would be no one other than

20    Mr. Hood.

21             THE COURT:  Well, that's my question.

22             MR. LAWLOR:  I don't -- you know what?  I'm not sure.

23    Let me talk to Mr. Hood, Your Honor.  I'm not sure.

24             THE COURT:  All right.  All right.

25             MR. WASSERMAN:  Thank you, Your Honor.
```

```
 1                    THE COURT:  Thank you.  Don't discuss your testimony,

 2        Officer Jacobs.  Okay?

 3                    THE WITNESS:  Yes.

 4                    THE COURT:  Okay.

 5                    THE WITNESS:  Am I free to go now?

 6                    THE COURT:  Yes.  Yes.

 7                    (Off-the-record discussion.)

 8                    MR. WASSERMAN:  Your Honor, can I just ask --

 9                    THE COURT:  Do you want to be on the record?

10                    MR. WASSERMAN:  Yes.

11                    THE COURT:  Go back on the record.

12                    MR. WASSERMAN:  When we get the audio, if there's

13        something on there pertinent, we would like to be able to have

14        the officer listen to it.  I realize that he's still in the

15        middle of his testimony, but I did want to give him -- but I

16        didn't want to go do that, if the Court felt that would be

17        inappropriate or --

18                    MR. LAWLOR:  No objection.

19                    THE COURT:  Okay.  He can listen to the tape.  I just

20        don't want him discussing with you folks, you know, any -- but

21        he should have a fair opportunity, and I want to hear it, too.

22        Okay.

23                    MR. WASSERMAN:  Very well.  Thank you.

24                              *    *    *

25
```

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of my

stenograph notes and is a full, true and complete transcript of

the proceedings to the best of my ability.

                    Dated this 23rd day of January, 2020.




                        /s/_____

                        Janice E. Dickman, CRR, RMR
                        Official Court Reporter
                        Room 6523
                        333 Constitution Avenue NW
                        Washington, D.C. 20001