```
                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA


     United States of America,       ) Criminal Action
                                     ) No. 19-cr-315
                     Plaintiff,      )
                                     ) MOTION HEARING
     vs.                             ) Day 2 of 2
                                     )
     DeShawn Hood,                   ) Washington, DC
                                     ) January 14, 2020
                     Defendant.      ) Time:  3:00 p.m.
     _____

                        TRANSCRIPT OF MOTION HEARING
                                HELD BEFORE
                   THE HONORABLE JUDGE ELLEN SEGAL HUVELLE
                        UNITED STATES DISTRICT JUDGE
     _____

                           A P P E A R A N C E S

     For the Plaintiff:        Vivian Kim
                               Steven B. Wasserman
                               U.S. Attorney's Office for the
                                 District of Columbia
                               555 Fourth Street, NW
                               Washington, DC  20530
                               (202) 252-7014
                               Email:  Vivian.kim@usdoj.gov
                               Email:  Steve.wasserman@usdoj.gov


     For the Defendant:        Michael Edward Lawlor
                               Brennan, McKenna & Lawlor, Chartered
                               6305 Ivy Lane, Suite 700
                               Greenbelt, MD  20770
                               (301) 474-5730
                               Email:  Mlawlor@verizon.net


     _____

     Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                               Official Court Reporter
                               United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
                               Washington, DC  20001
                               202-354-3267
```

1  THE COURT: Good afternoon.
2  MR. WASSERMAN: Good afternoon.
3  MR. LAWLOR: Good afternoon, Your Honor.
4  THE COURTROOM DEPUTY: Your Honor, this is criminal
5  case No. 19-315, United States of America versus DeShawn Hood.
6  Will counsel please approach the lectern and state
7  your appearances for the record.
8  MS. KIM: Vivian Kim and Steven Wasserman for the
9  United States.
10  THE COURT: Good afternoon.
11  MR. LAWLOR: Good afternoon, Your Honor, Michael
12  Lawlor for Mr. Hood.
13  THE COURT: Good afternoon, Mr. Hood.
14  Okay. I did receive something from Mr. Wasserman, a
15  tape. And perhaps we ought to put it into evidence through the
16  officer, who's here, I see. Okay.
17  MS. KIM: Government recalls officer James Jacobs.
18  JAMES JACOBS,
19  was called as a witness and, having been first duly sworn, was
20  examined and testified as follows:
21  THE COURT: Okay.
22  DIRECT EXAMINATION
23  BY MS. KIM:
24  Q. Good afternoon, Officer.
25  A. Good afternoon.

1    Q.  You've had the opportunity to listen to what's been marked
2    as Government's Exhibit 5, a radio run, is that correct?
3    A.  Yes.
4    Q.  And if we can pull up Government's Exhibit 5 to timestamp
5    of 55 minutes and 13 seconds.
6              THE COURT:  Any objection to its admission?
7              MR. LAWLOR:  No, Your Honor.
8              THE COURT:  Exhibit 5 is admitted.  Sorry.  Can you
9    just remind me, what other exhibits have you -- how many have
10   you put in?
11             MS. KIM:  In total there would be 6.  Exhibits 1A,
12   2 --
13             THE COURT:  1A is the first tape.
14             MS. KIM:  That's right, the body-worn camera footage.
15             Exhibit 2, which is a photograph of the gun recovered
16   from where it was recovered.  Exhibit 3, which is a photograph
17   of the firearm against a ruler.  And Exhibit 4, which was a
18   screen shot of the body-worn camera footage.  And now Exhibit
19   5, which is the radio run.
20             THE COURT:  And the screen shot.  Where are the
21   exhibits?
22             MS. KIM:  I have a folder.
23             THE COURT:  Okay.  If you can provide them to us.
24             MS. KIM:  Yes, Your Honor.  Oh, I'm sorry, Your Honor
25   there's one more exhibit, Exhibit 10, which was the hand-drawn

```
 1    map.
 2              THE COURT:  Okay.  That was drawn yesterday by the
 3    officer?
 4              MS. KIM:  That's correct, Your Honor.
 5              THE COURT:  And 5 is a still from the tape?
 6              MS. KIM:  That's correct.
 7              THE COURT:  No, 5 is the, sorry, the radio run.
 8              MS. KIM:  No.  Oh, yes, that's right.  No. 5 is the
 9    radio run, that's correct.
10              THE COURT:  What do we call these?  It's not really a
11    radio run.
12              THE WITNESS:  It's a radio transmission.
13              THE COURT:  Okay.  Radio transmission.  Okay.  Sorry.
14    Go ahead.
15              MS. KIM:  If we can go ahead and play government's
16    Exhibit 5 from timestamp 55:13.
17                  (Playing audio.)
18              MS. KIM:  Now, that was a very brief clip, but --
19              THE COURT:  Can we play it once more, please?
20                  (Playing audio.)
21    BY MS. KIM:
22    Q.  Now, do you recall receiving this transmission on September
23    16, 2019?
24    A.  Yes.
25    Q.  And having heard it again, what exactly was said on that
```

1   transmission?
2   A.  "Hey, speak to him real quick."
3   Q.  Is that what you recall someone saying to you over the
4   radio which informed you to approach the defendant?
5   A.  Yes.
6   Q.  Do you know whose voice that is?
7   A.  I believe it's Officer Joseph's.  But, it's either his or
8   Officer Murrell's.
9           MS. KIM:  Just a couple more questions, Your Honor.
10  We didn't have an opportunity to redirect.  If I may ask a few
11  more questions, and then we'll complete here.
12          THE COURT:  Okay.
13  BY MS. KIM:
14  Q.  At the time you stopped -- or, I'm sorry, at the time
15  Officer Torres stopped your car, did you have your police
16  lights on?
17  A.  I don't believe so.
18  Q.  Did you have your siren on?
19  A.  No.
20  Q.  And after you -- after you said the words, "Hold up a sec,"
21  do you recall what the defendant did?
22  A.  I believe he said:  You do not have my consent to search
23  me; kept his hands raised.
24  Q.  Did he stop in response to you saying, "Hold up a sec"?
25  A.  He kept walking.

```
 1    Q.  Did he change directions in any way?
 2    A.  No.
 3              THE COURT:  When you say he kept walking, can you
 4    explain what you mean?  Where is he when you say this and where
 5    does he keep walking?
 6              THE WITNESS:  He's still traveling, I believe it was
 7    Foote Street at that time, and traveling away from 42nd Street.
 8              THE COURT:  In the Street?
 9              THE WITNESS:  Yes.
10              THE COURT:  So about how far did he get before you
11    told him to stop after you saw the bulge?  In other words, how
12    many feet did he travel?
13              THE WITNESS:  I don't know that I actually told him
14    to stop.  I think he just stopped to continue speaking with me.
15    But I don't believe I actually said, "Stop."  I told him to
16    stop backing up at one point, when I could see the bulge.
17              THE COURT:  Okay.  Before you said that, how far did
18    he walk away from you?
19              THE WITNESS:  Maybe a few feet, a few yards, as in he
20    took that much more of a distance walking.  He was a little
21    further from me than a few feet at the time.
22              THE COURT:  He gained another couple of feet, is what
23    you're saying, before you said, "Stop backing up"?
24              THE WITNESS:  When I said, "Stop backing up," I had
25    almost closed the distance towards him at that point.
```

1   BY MS. KIM:
2   Q.  And just to clarify for the record, when exactly did you
3   see the defendant's arms up for the first time?
4   A.  When I noticed him on Foote Street, walking.
5   Q.  Was that before or after you exited the vehicle?
6           THE COURT:  I didn't hear it either.
7   BY MS. KIM:
8   Q.  Was that before or after you exited the vehicle?
9   A.  Before.
10          THE COURT:  Before who?  He exited the vehicle?
11  BY MS. KIM:
12  Q.  Yes, before -- is it before you, Officer Jacobs, exited the
13  vehicle?
14  A.  Before I did.
15          MS. KIM:  Nothing further from the government.
16          THE COURT:  Mr. Lawlor, anything for you?
17          MR. LAWLOR:  Court's indulgence, please.
18          (Pause.)
19          THE COURT:  Okay.  I have a question.  When you
20  exited the vehicle, is it correct that he's still walking away?
21          THE WITNESS:  Yes.
22          THE COURT:  And what did you do?  Are you running,
23  are you walking?
24          THE WITNESS:  I'm walking.  I'm walking around the
25  front of the vehicle, to come to the same side of the street

1    that he's walking from.
2            THE COURT:  I can get this better from the tape, but
3    where are you when you say, "Hold up a sec"?  Are you out of
4    the car and around the car door?  Or are you still behind the
5    car door?
6            THE WITNESS:  I believe at that point I was walking
7    across the front of the car.  But I would be able to tell you
8    better from watching the video.
9            THE COURT:  Okay.  Sorry.
10           MR. LAWLOR:  I don't have any questions, Your Honor.
11           THE COURT:  Okay.  Can you just play the first tape a
12   little bit?  Just play it from when -- the beginning.
13           Before you start, though, you're wearing a vest that
14   says "Police"?
15           THE WITNESS:  Yes.  With a badge affixed to it.
16           THE COURT:  I don't know if the court reporter can
17   hear you.
18           (Playing video.)
19           THE COURT:  Can you back it up a bit?
20           MR. WASSERMAN:  Yeah, I'll back it up, Your Honor.
21           THE COURT:  And can you remind me what the time is?
22           MR. WASSERMAN:  Yeah, I believe it's at the
23   two-minute mark of the tape.
24           THE COURT:  No, I'm sorry, the time when the
25   dispatcher says whatever she says.

1               MR. WASSERMAN:  You're talking about the radio
2     transmission, Your Honor?
3               THE COURT:  Yeah, she was ticking off the time.
4               MS. KIM:  Yes.  The exact time, Your Honor, is
5     23:24:47.  So 23 -- 11:24 and 47 seconds.
6               MR. WASSERMAN:  Would you like me to play the video,
7     Your Honor?
8               THE COURT:  Okay.  So you get this transmission
9     before you get out of the car?
10              THE WITNESS:  Yes.
11              THE COURT:  Okay.  Yes.  Sorry.
12              (Playing video.)
13              THE COURT:  Okay.  Go back again.  Sorry.  And can
14    you tell me when the other officer, Torres, puts the flashlight
15    on?  Just say it when it happens.
16              THE WITNESS:  I believe it's at the 2:07 or 2:08 mark
17    on the video.  From the still shot you'll be able to see it.
18    But I'll call it out again as the video plays.
19              MR. WASSERMAN:  I'm starting 1:58 of the recording,
20    Your Honor.
21              THE COURT:  Okay.
22              (Playing video.)
23              THE WITNESS:  Right there.
24              THE COURT:  There it is.  Okay.  What time is that?
25    2:10?

```
 1                THE WITNESS:  It was at 2:07.
 2                THE COURT:  2:07.
 3                MR. WASSERMAN:  Did you want me to continue, Your
 4      Honor?
 5                THE COURT:  And had you seen the bulge by this time?
 6                THE WITNESS:  Yes.
 7                THE COURT:  I can't remember exactly what time on
 8      this -- go back.  Then let's get the time exact.
 9                Okay.  It's 2:00.
10                (Playing video.)
11                THE COURT:  And when did you see the bulge?
12                THE WITNESS:  If Officer Torres shined the light at
13      2:07, then I probably saw it at 2:05 or 2:06.  Right as he's
14      turning his body towards me.
15                THE COURT:  Okay.  Anything else, Mr. Lawlor?
16                MR. LAWLOR:  No, Your Honor.
17                THE COURT:  Okay.  Thank you.
18                Anything for the defense?  Is that it for the
19      government?
20                MS. KIM:  That's correct, Your Honor.
21                MR. LAWLOR:  No, thank you.
22                THE COURT:  No?
23                MR. LAWLOR:  No.
24                THE COURT:  Okay.  All right.  The Court is going to
25      read the cases cited in the -- by the parties in their briefs,
```

1     which were helpful, and will issue a written opinion within
2     five to ten days.  So, it should be done quickly.
3               So, we'll take it under advisement and issue a
4     written opinion.  Thank you.
5               MR. LAWLOR:  Your Honor, could I have your indulgence
6     for one moment?
7               THE COURT:  Sure.
8               You can step down.
9               (Off-the-record discussion between Attorney Lawlor
10    and defendant.)
11              THE COURT:  What's today's date?  14th.
12              Counsel, when we finish with the exhibits, we'll give
13    them back to you.
14              MR. WASSERMAN:  Very well, Your Honor.
15              Your Honor, with respect to Government's Exhibit 1A,
16    which we provided to chambers, if we can just use that exhibit
17    that we provided -- provided to chambers as the exhibit for
18    purposes of filing the record?
19              THE COURT:  What's wrong with this one?
20              MR. WASSERMAN:  Yeah, with the body-worn camera on
21    it, 1A.
22              THE COURT:  Yeah.
23              MR. WASSERMAN:  Okay.  I just wanted to make sure it
24    was okay to use your copy as the --
25              THE COURT:  This isn't my copy.

```
 1                 MR. WASSERMAN:  Was this the copy --
 2                 MS. KIM:  We provided the initial copy.
 3                 MR. WASSERMAN:  Okay, perfect.  Disregard.
 4                 MR. LAWLOR:  Your Honor, if I could just, you know,
 5     Mr. Hood -- he wants to make sure that the best presentation is
 6     here.  I've advised him -- he's done a lot of research, I've
 7     advised him that we did, as well, last night, filed a brief
 8     with the Court citing --
 9                 THE COURT:  Well, if he has any authority he wants me
10     to read --
11                 MR. LAWLOR:  Okay.  Is there anything -- is there a
12     case you want the Court to read, Mr. Hood?
13                 THE COURT:  You may have cited some of these, so --
14                 MR. LAWLOR:  I think I did, Your Honor.  And so I'm
15     looking for -- I mean, Mr. Hood, you know, so he -- what I
16     think we argued, that he wants the Court to be aware of, is
17     he's of the mindset, as am I, that at the time the stop
18     occurred the police lacked reasonable articulable suspicion to
19     stop him, and that's a violation of the Fourth Amendment.
20                 So I want to make sure that Mr. Hood hears that I
21     am -- I know these have moved kind of fast, these hearings, and
22     I think the Court knows what the argument is.  I think the
23     Court knows where the dividing line is between the government
24     and the defense.  But these hearings moved fast and so I want
25     to make sure that Mr. Hood --
```

1           THE COURT:  The key issue, should the Court -- and I
2    understand what the issue is, is did the stop occur when he
3    says, "Hold on a sec," or did it occur after he saw the bulge?
4           MR. LAWLOR:  And our position is -- forgive me for
5    interrupting -- and we cited the *Castle* case here, Your Honor.
6    And it is -- and, I think, again, both parties have cited
7    cases, the Court is required to look at a litany of factors to
8    determine when a stop occurred.  We do believe that based on
9    the first contact with the police, that the second car stopping
10   where it stopped, the shining of the flashlight on his body,
11   two officers plainly marked as police exiting the vehicle, and
12   then Officer Jacob saying, "Hold on a sec," we believe that the
13   totality of the circumstances, that amounts to a seizure under
14   the Fourth Amendment.
15          And I believe Officer Jacobs -- even though the
16   government is arguing to the contrary in their papers -- but I
17   don't believe there's a strong argument that can be made that
18   at the time, which we posit is when Mr. Hood was seized, that
19   there was reasonable articulable suspicion at that moment.  And
20   we believe that the cases that we've cited, which are recent
21   authority from the D.C. Circuit, support that proposition.
22          THE COURT:  Right.  Let me just correct one or two
23   facts, which is that -- that's why I went over with him what I
24   went over.  He didn't shine the flashlight until after -- at
25   the time or just after they -- this officer, Jacobs, saw the

1  bulge.  The flashlight came after he said, "Hold up a sec."
2          MR. LAWLOR:  Well, I would argue, Your Honor, the
3  issue is whether or not Mr. Hood -- a reasonable person in
4  Mr. Hood's position would believe that he was free to leave.
5  So you don't need to have it shined into your eyes for it to
6  have an effect.  The point is, he's in a residential
7  neighborhood, walking to his home, when two police officers
8  exit a car, one of them holding a flashlight.  So --
9          THE COURT:  Yeah, he may have been holding it, but I
10 don't have any evidence that it was on until Jacobs saw a
11 bulge --
12         MR. LAWLOR:  I understand.
13         THE COURT:  -- after he said, "Hold on a sec."  The
14 key difference between your position and the government's is
15 whether "Hold on a sec" under the circumstances constitutes a
16 stop without articulable suspicion, or is the stop when they
17 tell him to stop backing away?
18         MR. LAWLOR:  Right.  And, Your Honor, for the record,
19 we would also argue, as a secondary issue, that the bulge
20 itself is still not sufficient articulable suspicion, even
21 after Officer Jacobs sees it.  But that is our secondary
22 position.  The primary argument is the one that the Court just
23 laid out, that, "Hold on a sec," in conjunction with all the
24 other factors that were elicited orally and in our moving
25 papers, amounts to a stop under the Fourth Amendment, short of

```
 1        the time the officer was in possession of reasonable

 2        articulable suspicion that criminal activity was afoot.

 3                  THE COURT:  Okay.  I do understand.  And your best

 4        case is Castle, is that your position?

 5                  MR. LAWLOR:  We cited several cases, Your Honor.  I

 6        do think Castle has some -- there -- it's not on all fours, but

 7        there's sort of similar language, where they say, "Hold on."

 8        And so I just think it doesn't have to be, "Hey, we're the

 9        police, stop," for it to be a stop.

10                  THE COURT:  But they didn't actually analyze that

11        issue.  In Castle they were trying to figure out whether the

12        guy had seen the police.  That's what they were wondering,

13        whether a furtive gesture indicated anything.  I don't think

14        anybody contested the -- when the stop occurred, frankly.

15                  MR. LAWLOR:  Well, all the better then.

16                  THE COURT:  Hum?

17                  MR. LAWLOR:  All the better.  The government's

18        conceding that that's a stop then.

19                  THE COURT:  I don't know they conceded.  They're

20        saying the Court didn't address it.  I haven't read the other

21        one or two that you cited.  Does he have any he wants me to

22        read, though?

23                  MR. LAWLOR:  Your Honor, I'm of the opinion that the

24        cases cited by Mr. Hood in his draft briefs are prior to

25        anything and everything that we've cited to the Court.  But if
```

1   there's something in there, I'll get a short supplement to my
2   supplement to the Court.
3           THE COURT:  Or you can give us the citation.
4           MR. LAWLOR:  Okay.  I don't see anything in there,
5   Your Honor, that I think is --
6           THE COURT:  Does the prosecutor want to respond?
7   There are three cases he cited.  In the time I had, I read one
8   and a half.  But, how do you distinguish?  He's relying on
9   *Jones*, *Wood* -- *Jones*, *Wood*, and *Castle*.
10          MS. KIM:  Thank you, Your Honor.  I do want to
11  briefly address each of these cases, and they are all
12  distinguishable.  I think one of the things to really focus on
13  are the facts in our case, is that it's really just the words,
14  "Hold up a sec" that's in question here.  Otherwise, the
15  defendant's movements were not restricted, the officers were
16  not pulling out their firearms, they were not using a loud tone
17  of voice or authoritative tone of voice.  In fact, he said he
18  used the conversational voice, similar to the one that he used
19  when he testified.  It was in an open space, not confined to an
20  alley.  And so that's one way we can distinguish it from *Wood*.
21          In *Wood*, the officers actually -- there's two
22  officers who chased the defendant into a building and
23  essentially had him cornered.  And the officer was right up
24  behind the defendant when he said, "Halt right there.  Stop."
25          These are much more restringent -- stringent and

1  restrictive circumstances in which a defendant would feel that
2  they were not free to leave.  That's not the circumstance we
3  have in our case.
4  　　　　　As for *Castle*, Your Honor, the words are similar, the
5  government agrees with that.  But in *Castle*, the officer
6  touched the arm of the defendant and told him to "Hold on a
7  sec."  And in fact, prior to that, he had ran up to the
8  defendant, in a dark, narrow alley, effectively blocking his
9  way, and ordered him to remove his hands from his pockets.
10 This all happened prior to him telling the defendant to hold on
11 and touching him with his hand.
12 　　　　　Once again, much more restrictive circumstances than
13 the case that we have here.
14 　　　　　And finally, for *Jones*, we had a situation where the
15 words are, "I need to talk to you for a second.  You need to
16 stop."  Also, the officer used his body to block the defendant.
17 Once again, his movements were restricted.  And this is a
18 circumstance that's much more restrictive than what we have in
19 our instant case.
20 　　　　　We submit that all the other factors, if you look at
21 the totality of the circumstances, was one where the defendant
22 would feel free to leave.  It's just the words, not even the
23 way the words were expressed, but the words, "Hold up a sec"
24 that's in question here, and that's not sufficient enough to
25 say that there wasn't reasonable articulable suspicion here.

| | |
|---|---|
| 1 | Thank you, Your Honor. |
| 2 | THE COURT:  Say that last sentence again. |
| 3 | MS. KIM:  Just the words, not even the way it's |
| 4 | expressed, but no other factors, other than the words, would |
| 5 | show that there's any type of restriction to the defendant's |
| 6 | ability to leave freely, and that's insufficient. |
| 7 | THE COURT:  That's insufficient to constitute a |
| 8 | seizure? |
| 9 | MS. KIM:  That's correct, Your Honor. |
| 10 | THE COURT:  Okay. |
| 11 | MR. LAWLOR:  Your Honor, just on that point, I think |
| 12 | the tape belies that fact because if you look at -- if you look |
| 13 | at the car, where it stops, it's a police car, obviously, |
| 14 | stopped in the middle of the road, the officers jump out; they |
| 15 | don't pull into a parking spot, they stop in the middle of the |
| 16 | road.  And you can see from the body-worn camera Officer Jacobs |
| 17 | gesturing with his hand.  And then, most importantly, I think |
| 18 | the video -- I'm not accusing Officer Jacobs of being -- sort |
| 19 | of purposely stating a falsehood here, I think it's his |
| 20 | recollection, but I think the video is contrary to his |
| 21 | testimony that the defendant did not stop. |
| 22 | He's walking, he stops, and then as the officer gets |
| 23 | closer, he's retreating a couple steps, which is when Officer |
| 24 | Jacobs says, you know, "Stop backing up," or words to that |
| 25 | effect.  But I think the location of the car, Officer Jacob's |

1    hand gestures, and the words -- and, Your Honor, the
2    difference, from our point of view, is, you know, a
3    conversation or an approach is a request, "May I speak to you?"
4    "Hold up" is a command.  And the distinction between "Hold up"
5    and "Stop" we believe is insignificant.  It's a command to stop
6    that was acceded to by the defendant and that's why it's a
7    Fourth Amendment event, Your Honor.
8            THE COURT:  Is it your position that whenever the
9    police go up to somebody and say, "Hold up, I want to ask you
10   some questions," would that be okay?
11           MR. LAWLOR:  No, but it's not, "Hold up, I want to
12   ask you some questions."
13           THE COURT:  I know.  I'm just asking.
14           MR. LAWLOR:  I don't want to suggest where the
15   dividing line is.  I will concede, of course, that there is
16   one:  May I ask you a few questions?  Hey, Pal, how you doing
17   today?  I'm not prepared to say, because it's obvious that the
18   case law says that every encounter between the police and a
19   pedestrian or citizen is not a seizure under the Fourth
20   Amendment.  But that's not this.  It was not a request, it was
21   a command.
22           THE COURT:  Okay.  All right.  Thank you.
23           MR. LAWLOR:  Thank you, Your Honor.
24           MS. KIM:  Thank you, Your Honor.
25           THE COURT:  Okay.
                            *   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 23rd day of January, 2020.

/s/_____

Janice E. Dickman, CRR, RMR
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001